FILED
United States Court of Appeals
Tenth Circuit

**March 3, 2009**

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.

JUPITER LAMAR ROGERS,

     Defendant-Appellant.

No. 07-6299

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. CR-07-56-C)**

---

Bill Zuhdi, Bill Zuhdi Attorney at Law, P.C., Oklahoma City, Oklahoma, for Defendant-Appellant.

Jonathon E. Boatman, Assistant United States Attorney (John C. Richter, United States Attorney, with him on the briefs), Oklahoma City, Oklahoma, for Plaintiff-Appellee.

---

Before **BRISCOE**, **BALDOCK**, and **HOLMES**, Circuit Judges.

---

**BALDOCK**, Circuit Judge.

---

Defendant Jupiter Lamar Rogers was charged and convicted for (1) conspiring to distribute crack-cocaine, in violation of 21 U.S.C. § 846; (2) possession with intent to distribute crack-cocaine, in violation of 21 U.S.C. § 841(a)(1);

(3) possessing two handguns in furtherance of a drug-trafficking conspiracy, in violation of 18 U.S.C. § 924(c)(1)(A); and (4) being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). Defendant raises five issues on appeal. First, Defendant contends the district court erred in excluding a hotel departure record and accompanying testimony by the record's alleged custodian. Second, Defendant argues the arresting officer illegally seized him in violation of the Fourth Amendment. Third, Defendant maintains the evidence at trial was insufficient to sustain his convictions on all four counts. Fourth, Defendant argues that the prosecutor's allegedly improper remarks during closing argument violated due process. Fifth, Defendant urges reversal based on the district court's alleged cumulative error. We have jurisdiction under 28 U.S.C. § 1291, and affirm.

I.

Because a jury convicted Defendant, we recount the relevant facts in the light most favorable to the Government. See United States v. Weidner, 437 F.3d 1023, 1027 (10th Cir. 2006). In February 2007, Oklahoma City Police Officer Shawn Lindsey was patrolling the hallway of a local hotel known for drug activity and prostitution. Officer Lindsey saw Defendant, whom he already knew as "Graveyard," exiting one of the hotel suites. Officer Lindsey approached Defendant and asked him if he could speak with him. Officer Lindsey had encountered Defendant on previous occasions, during which Defendant consistently portrayed a calm and confident demeanor. On this particular occasion, however, Defendant

2

appeared unusually nervous to Officer Lindsey. Defendant backed into the suite and informed Officer Lindsey that he should talk to his "brother," and pointed towards co-defendant Curtis Robertson who was lying on a bed in the bedroom area of the suite. As Defendant was backing into the suite, Officer Lindsey saw Defendant slip his arm behind the suite's door, after which Officer Lindsey heard an object fall to the floor in the corner of the room. Officer Lindsey then noticed a small bag of marijuana sitting on the floor in the middle of the suite's living room. Due to Defendant's abnormal behavior and the marijuana in plain view, Officer Lindsey entered the suite and handcuffed Defendant and Robertson (who had walked from the bedroom into the suite's living room).

Officer Lindsey searched the hotel suite. He first retrieved the object he believed Defendant discarded, later identified as a sack of twenty-six crack-cocaine rocks individually packaged for sale. After making his way into the bedroom, Officer Lindsey found a woman he recognized as a local crack addict and prostitute. Officer Lindsey also noticed a razor blade covered in white residue located on the bedroom nightstand. Finally, Officer Lindsey saw an open shoe box on the bedroom desk holding a set of digital scales, two vials of PCP, plastic gloves, and plastic bags containing marijuana, crack-cocaine crumbs, and a large "crack cookie."[1] Officer Lindsey subsequently placed Robertson, Defendant, and the prostitute under arrest.

---

[1] Investigators later determined that the crack-cocaine located in the hotel suite totaled approximately 50 grams.

3

Further search of the hotel suite, which was registered under the name "Ricky Smith," revealed seven cell phones, Pyrex measuring cups, a wire whisk, and baking powder next to the suite's microwave oven. In the nightstand, police found two handguns, as well as ammunition. Officers later determined that one of the phones belonged to Defendant. The contact list in Defendant's cell phone contained Robertson's phone number. In addition, Officer Lindsey's search of each suspects' person revealed ninety-seven twenty-dollar bills on Robertson and seven twenty-dollar bills on Defendant, along with smaller bill denominations on both defendants. At the time, neither defendant could explain to Officer Lindsey how they obtained the money.

At trial, Officer Lindsey and Sergeant Billy Moon, an Oklahoma City narcotics officer, testified as to the significance of the evidence discovered in the hotel suite, explaining that the materials located in the hotel suite—such as the baking powder, pyrex cups, plastic gloves, and digital scales—were frequently used to manufacture crack-cocaine. In addition, both officers testified that the large number of cell phones was consistent with the common practice of drug dealers to use multiple cell phones in conducting their business. Officer Lindsey and Sergeant Moon also testified that the hotel where Defendant was arrested was a well known hotbed for drug trafficking. Sergeant Moon further testified that all of the discovered items were typical of a hotel drug trafficking operation in which a "stash" room—where the crack-cocaine is manufactured—is manned by one or two dealers. A "runner"

4

then distributes individually packaged crack-cocaine rocks to buyers and other runners located throughout the hotel. Sergeant Moon testified that drug dealers in charge of such operations generally do not check into hotel rooms under their own names.

After the Government rested its case-in-chief, Defendant offered the testimony of Angelique Mousel, the hotel desk clerk on duty the night of the arrest. Mousel testified that Defendant entered the hotel and engaged in conversation with her at the front desk just prior to the arrest. Mousel stated that while she was speaking with Defendant, Officer Lindsey called for Defendant from the hotel's hallway. Mousel claimed that Defendant then walked into the hallway towards Officer Lindsey. Mousel testified that she walked over to the hallway no more than three minutes after Defendant was called by Officer Lindsey, and saw Defendant on the hallway floor in handcuffs. Despite the conflict between Mousel's testimony and Officer Lindsey's version of the events, the jury convicted Defendant on all counts.

## II.

Defendant first argues the district court erred in excluding a hotel departure log, as well as accompanying testimony from the hotel manager, Robert Van Raamsdonk.[2] The document indicated that "Ricky Smith" checked out of the hotel

___

[2] On appeal, Defendant argues that Raamsdonk's testimony is relevant, not only as the custodian of record for the hotel departure log, but also to rebut testimony by the Government's expert that the hotel did not regularly check

(continued...)

room where Defendant was arrested one day after the arrest. We review evidentiary

rulings for abuse of discretion. See United States v. Pulido-Jacobo, 377 F.3d 1124,

1131-32 (10th Cir. 2004). When the proffered evidence is hearsay, our review is

even more deferential. See id. at 1132. Even if we find the district court erred in

excluding hearsay evidence, we will not take corrective action if the error is

harmless. See id. (citing Fed. R. Crim. P. 52(a)).

Because the hotel departure log was offered for its truth, *i.e.*, "Ricky Smith"

checked out of the hotel room the day after the arrest, the document is hearsay. See

United States v. McIntyre, 997 F.2d 687, 699 (10th Cir. 1993) (hotel registration

cards offered to prove dates when a criminal suspect stayed at a hotel were hearsay).

Therefore, the departure log is not admissible unless an exclusion or exception to the

Federal Rules of Evidence applies. See Fed. R. Evid. 802. Defendant offered the

departure log under the business records exception to the hearsay rule. See Fed. R.

Evid. 803(6).[3] To satisfy the business records exception, the proposed document

---

[2](...continued)
identification when checking individuals into the hotel. When arguing for the admission of Raamsdonk's testimony to the district court, however, Defendant never made this argument and we consider it waived. See United States v. Porter, 405 F.3d 1136, 1141-42 (10th Cir. 2005) ("We do not consider issues not presented to the district court, and they are deemed waived."). Our review of Raamsdonk's proffered testimony, therefore, is only considered in connection with his alleged role as the custodian of record for the hotel departure log.

[3] The business records exception under Federal Rule of Evidence 803(6) is for:

(continued...)

6

must "(1) have been prepared in the normal course of business; (2) have been made at or near the time of the events recorded; (3) be based on the personal knowledge of the entrant or of a person who had a business duty to transmit the information to the entrant; and (4) indicate the sources, methods and circumstances by which the record was made trustworthy."  United States v. Ary, 518 F.3d 775, 786 (10th Cir. 2008).

During voir dire, Raamsdonk testified he was general manager of the hotel during the time of the arrest, that the hotel was obligated to keep an accurate departure log for tax purposes, and that he was the custodian of the hotel departure log.  The Government objected to the departure log and Raamsdonk's testimony, arguing the document was hearsay and not sufficiently reliable to meet the business records exception under Rule 803(6).  The Government contended the departure log at issue was different from the original log provided to investigating officers and

_____

[3](...continued)
A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12), or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.  The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

7

offered by Defendant during the suppression hearing. The district court sustained the Government's objection on the ground that the departure log was unreliable. The district court further held that the log did not meet Federal Rule of Evidence 403's requirements because the jury already heard the room was registered to "Ricky Smith" and the document would only cause undue delay and confusion.

Given the "fact and case specific" nature of hearsay determinations, and the consequent heightened deference we afford to the district court when evaluating such determinations, we do not believe the district court abused its discretion in excluding the hotel departure log under Rule 803(6). United States v. Trujillo, 136 F.3d 1388, 1395 (10th Cir. 1998). The existence of a *different* departure log, provided to investigators prior to trial, is enough to question the "circumstances by which the record was [allegedly] made . . . trustworthy." Ary, 518 F.3d at 786. Moreover, the log's reliability was further clouded by Government witnesses testifying that the hotel did not have a consistent policy of checking customers' identification. See McIntyre, 997 F.2d at 700-01 (noting the district court may have erred in admitting a hotel registration log without evidence that the identification of the alleged customer was checked or that the hotel had a policy of doing so). While Raamsdonk indicated that the hotel did have a policy of checking identification, the district court was in the best position to assess the general reliability of both the departure log and Raamsdonk's accompanying testimony. See J. Weinstein & M. Berger, Weinstein's Evidence § 803.08[6][a], at 803-67 (2008).

8

The district court's exclusion of the departure log is further supported by its minimal probative value to Defendant. The jury heard the hotel suite was checked out to "Ricky Smith." Moreover, the hotel departure log does little to cast doubt on Defendant's presence in the hotel suite the night of the arrest. Because of the questions surrounding the departure log's reliability and its minimal probative value, we cannot say the district court erred in excluding the hotel departure log. See Fed. R. Evid. 403 ("evidence may be excluded if its probative value is substantially outweighed by . . . considerations of undue delay, waste of time, or needless presentation of cumulative evidence"); see also F.D.I.C. v. Oldenburg, 34 F.3d 1529, 1555-56 (10th Cir. 1994) (noting that deference must be given to the district court in "viewing the evidence and assessing its probative value").

## III.

Defendant next alleges that he was seized in violation of the Fourth Amendment when Officer Lindsey approached him in the hallway outside the hotel suite. As such, Defendant argues that all the evidence collected after the alleged seizure should have been suppressed. We review de novo "the relevant circumstances to determine whether an interaction between an individual and a law enforcement officer is a consensual encounter that does not implicate the Fourth Amendment." United States v. Abdenbi, 361 F.3d 1282, 1291 (10th Cir. 2004). Relevant circumstances include: (1) the threatening presence of several officers; (2) the brandishing of a weapon by an officer; (3) physical touching by an officer;

9

(4) aggressive language or tone of voice by an officer indicating compliance is compulsory; (5) prolonged retention of an individual's personal effects; (6) a request to accompany an officer to the police station; (7) interaction in a small, enclosed, or non-public place; and (8) absence of other members of the public. See Jones v. Hunt, 410 F.3d 1221, 1226 (10th Cir. 2005). The list of factors is not exhaustive, nor is any one factor dispositive. See United States v. Thompson, 546 F.3d 1223, 1226 (10th Cir. 2008). We must review the totality of the circumstances to determine whether "a reasonable person would have believed that he was not free to terminate an encounter with government officials." Id.

Here, Officer Lindsey was alone when he approached Defendant outside the hotel suite. Officer Lindsey did not touch Defendant, use aggressive language, brandish a weapon, or retain any of Defendant's personal effects. The encounter did take place in the absence of any other members of the public, but "this one factor by itself does not determine whether a seizure has occurred." United States v. Zapata, 997 F.2d 751, 757 (10th Cir. 1993). The record suggests that Officer Lindsey and Defendant had similar encounters in the same hotel on previous occasions—during which Defendant was not threatened or intimidated by Officer Lindsey. Finally, the encounter lasted only seconds, in which Officer Lindsey asked Defendant one question, i.e., whether he could speak with Defendant. "[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions." Florida v. Bostick, 501 U.S. 429, 434 (1991). Thus, the totality of the circumstances

10

surrounding this encounter simply do not indicate that Officer Lindsey somehow "restrained the liberty" of Defendant. Id. We, therefore, conclude that Officer Lindsey's encounter with Defendant was consensual.

IV.

Defendant next argues that the evidence at trial was insufficient to uphold his convictions. We review the sufficiency of the evidence de novo. See United States v. Bowen, 527 F.3d 1065, 1075 (10th Cir. 2008). In reviewing the evidence, we are "limited to determining whether a reasonable jury could find the defendant guilty beyond a reasonable doubt, if it viewed all direct and circumstantial evidence, as well as all reasonable inferences drawn from that evidence, in the light most favorable to the Government." Id. at 1076. In addition, we will "not assess the credibility of witnesses or weigh conflicting evidence, as these tasks are exclusively for the jury." Id.

A.

We first address Defendant's conspiracy conviction. The Government must prove four elements beyond a reasonable doubt to sustain a conspiracy conviction. See United States v. McCullough, 457 F.3d 1150, 1159 (10th Cir. 2006). The elements include "(1) an agreement with another person to violate the law, (2) knowledge of the essential objectives of the conspiracy, (3) knowing and voluntary involvement, and (4) interdependence among the alleged conspirators." Id. An agreement to violate the law can be inferred by the conduct of the parties, as well as

11

the facts and circumstances of the case. See id. at 1160. Likewise, the jury may presume a defendant is a knowing participant when he acts in furtherance of the conspiracy's objectives. See United States v. Green, 175 F.3d 822, 832 (10th Cir. 1999). Interdependence is established when each co-conspirators' actions are necessary to accomplish a common, illicit goal. See McCullough, 457 F.3d at 1161.

Here, the Government presented more than sufficient evidence to uphold the conspiracy conviction. Officer Lindsey approached Defendant while exiting the room of a hotel known for frequent drug-trafficking and prostitution. Lindsey testified that Defendant appeared significantly more nervous than on previous encounters. Officer Lindsey testified that he believed Defendant threw something into the corner of the hotel room—precisely where Officer Lindsey later found a sack of twenty-six crack-cocaine rocks individually packaged for sale. Officer Lindsey and Sergeant Moon both testified that Defendant's and Robertson's actions were consistent with a typical narcotics distribution operation run out of a hotel room. Specifically, a search of the hotel suite revealed numerous items used for narcotics production and distribution, including copious amounts of drugs and various drug paraphernalia. Defendant was found with over $200 in cash, including seven twenty dollar bills. Both Officer Lindsey and Sergeant Moon testified that this denomination is most frequently used in purchasing crack-cocaine. Defendant could not explain how he obtained the money. Defendant's cell phone was located inside the hotel room and the phone contained his co-defendant Robertson's phone number

12

in the contact list. Finally, the jury heard that Defendant had a prior drug-trafficking conviction for participating in a nearly identical narcotics distribution operation run out of a different hotel room.

With such facts, a rational jury could reasonably infer that the hotel suite was the "stash" room—described during Sergeant Moon's testimony—and that Defendant knowingly acted as the "runner" by distributing the crack-cocaine individually packaged for sale. See Bowen, 527 F.3d at 1076 ("An inference is reasonable where a probability exists that a conclusion flows from the proven facts."). Defendant takes issue with the credibility of Officer Lindsey's testimony and suggests the testimony of Angelique Mousel supports his contention that no rational juror could find Defendant guilty of conspiracy. As previously noted, we are *not* permitted to assess the credibility of witnesses. See id. Obviously, the jury found Officer Lindsey more credible—an unsurprising outcome considering that Officer Lindsey's testimony was corroborated by the discovery of Defendant's cell phone *inside* the hotel room. Accordingly, the record provides ample evidence for a rational juror to conclude that (1) Defendant and Robertson conspired to distribute narcotics out of the hotel suite, (2) Defendant knew the objectives of this conspiracy, (3) Defendant took knowing and voluntary steps to further the conspiracy, and (4) Defendant's role was essential to the ultimate objectives of the conspiracy.[4]

---

[4] Defendant also alleges insufficient evidence for his possession with

(continued...)

13

B.

We next address Defendant's conviction for possessing two handguns in furtherance of a drug-trafficking conspiracy, in violation of 18 U.S.C. § 924(c)(1)(A). Defendant argues the evidence was insufficient to connect him to the handguns found in the nightstand of the hotel suite. A violation for "possession in furtherance, requires the government to show that the weapon furthered, promoted or advanced a drug trafficking crime." United States v. Luke-Sanchez, 483 F.3d 703, 706 (10th Cir. 2007). Accordingly, the Government must "establish some nexus between the firearms and the underlying drug trafficking crime." Id. A sufficient nexus can be demonstrated by showing a defendant intentionally kept a firearm available while conducting a drug transaction. See McCullough, 457 F.3d at 1170. The intent to possess the weapon to further the drug trafficking crime is generally proven through circumstantial evidence, such as "the type of drug activity being

---

[4](...continued)
intent to distribute crack-cocaine conviction, in violation of 21 U.S.C. § 841(a)(1). To sustain this conviction, the Government had to prove that Defendant "(1) possessed a controlled substance, (2) knew he possessed a controlled substance, and (3) intended to distribute the controlled substance." United States v. Burkley, 513 F.3d 1183, 1189 (10th Cir. 2008). For the same reasons cited in support of Defendant's conspiracy to distribute narcotics conviction, the Government provided sufficient evidence that Defendant knowingly possessed crack-cocaine and intended to distribute it throughout the hotel. See United States v. McKissick, 204 F.3d 1282, 1291 (10th Cir. 2000) ("Constructive possession may be established by circumstantial evidence and may be joint among several individuals. . . . The government must present some evidence supporting at least a plausible inference that the defendant had knowledge of and access to the contraband.").

14

conducted, the accessibility of the firearm, the type of firearm, the legal status of the firearm, whether the firearm is loaded, the proximity of the firearm to drugs or drug profits, and the time and circumstances under which the firearm is found." United States v. Trotter, 483 F.3d 694, 701 (10th Cir. 2007).

The handguns—a loaded .40 caliber Glock semi-automatic pistol and a .22 caliber revolver—were found in the bedroom nightstand only five feet from a shoebox containing large amounts of crack-cocaine, as well as PCP and marijuana. See McCullough, 457 F.3d at 1170 (noting that easily accessible, fully loaded weapons in a house with large quantities of drugs was evidence of the "in furtherance of" element of 18 U.S.C. § 924(c)(1)(A)). Moreover, Officer Lindsey witnessed Defendant leaving the very hotel suite where the handguns were found only minutes later, and Defendant's cell phone was located inside the same bedroom containing the guns and drugs. See United States v. Robinson, 435 F.3d 1244, 1251 (10th Cir. 2006) (noting that circumstantial evidence of the accessibility of the firearm to a defendant and the proximity of the firearm to the drugs supports an 18 U.S.C. § 924 (c)(1)(A) conviction). Finally, the Government's expert testified that in a "stash" room, where large amounts of narcotics and items for manufacturing narcotics are located, drug dealers usually have firearms for protection from any potential robbery. See Trotter, 483 F.3d at 702 ("When guns and drugs are found together and a defendant has been convicted of possession with intent to distribute, the gun, whether kept for protection from robbery of drug-sale proceeds, or to enforce payment . . .,

15

may reasonably be considered to be possessed in furtherance of an ongoing drug-trafficking crime.") (citation omitted).  Accordingly, we conclude the Government provided sufficient evidence to prove the firearms were possessed in furtherance of Defendant's and Robertson's conspiracy to distribute narcotics.[5]

V.

Defendant also argues that the prosecutor made improper remarks during closing argument that violated due process and warrant reversal of his conviction. Allegations of prosecutorial misconduct are mixed questions of fact and law that require a two-step process for review.  See Pulido-Jacobo, 377 F.3d at 1134.  We first determine whether the prosecutor's conduct was in fact improper, and second, whether the error was harmless beyond a reasonable doubt.  See id.  The Government bears the burden of proving the error is harmless beyond a reasonable doubt.  See id. We determine whether an error is harmless by looking at "the curative acts of the district court, the extent of the misconduct, and the role of the misconduct within the case as a whole."  Id.  Essentially, the conduct must be "flagrant enough to influence the jury to convict on grounds other than the evidence presented."  United States v.

---

[5] Because the Government presented sufficient evidence to support Defendant's possession of a firearm in furtherance of a drug-trafficking conspiracy, we likewise find sufficient evidence to support Defendant's conviction for being a felon in possession of a firearm.  See 18 U.S.C. § 922(g)(1) (statute barring convicted felons from possessing firearms or ammunition). Defendant's status as a felon is undisputed, thereby making his possession of firearms in furtherance of  this conspiracy a violation of 18 U.S.C. § 922(g)(1) as well.

16

Gabaldon, 91 F.3d 91, 94 (10th Cir. 1996).

A.

Defendant first argues the following statement of the prosecutor at closing argument improperly invoked religious support for Defendant's conviction: "And [Officer Lindsey] would walk in [to the hotel], as he did on this occasion, alone, *armed with a cross on his belt* and a gun on his side, into the belly of the beast like a surgeon aiming for the cancer as he came across it." R., Tr. of Jury Trial, at 363 (emphasis added). Defendant contends that the jury would have to be voting against the cross to find him innocent. Because Defendant did not object to this statement at trial, we review only for plain error. See United States v. Taylor, 514 F.3d 1092, 1095 (10th Cir. 2008). Plain error requires Defendant to demonstrate that "there is (1) error, (2) that is plain, which (3) affects the defendant's substantial rights, and which (4) seriously affects the fairness, integrity or public reputation of judicial proceedings." Id. at 1100.

We assume without deciding that the prosecutor's comment about the cross was improper. See, e.g., Fed. R. Evid. 610 ("Evidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature the witness' credibility is impaired or enhanced."). If this was error, however, it does not rise to the level of plain error. As described in our discussion of Defendant's insufficient evidence argument, the Government introduced very strong evidence to support Defendant's convictions. See United

17

States v. Pena, 930 F.2d 1486, 1491 (10th Cir. 1991) (noting that an improper remark must be viewed "against the backdrop of the entire record before the jury"). Moreover, the jury was properly instructed that closing arguments are not evidence and that Defendant should only be convicted on the basis of evidence submitted at trial. We presume the jury follows its instructions. See United States v. Almaraz, 306 F.3d 1031, 1037 (10th Cir. 2002). Finally, the comment regarding Officer Lindsey's cross was singular and isolated. See United States v. Oberle, 136 F.3d 1414, 1421 (10th Cir. 1998) (noting that the singular and isolated nature of improper commentary is a factor in determining whether it affected the fairness of the trial). Thus, "[w]hen taken in context of the entire trial and the lengthy closing arguments . . ., the objectionable reference[] did not significantly detract from the proper focus of the argument." Id. at 1422. We conclude, therefore, that Defendant failed to demonstrate that the prosecutor's statement affected his "substantial rights." Taylor, 514 F.3d at 1100; see also United States v. Mendoza, 543 F.3d 1186, 1194 (10th Cir. 2008) ("Under the plain error standard, we reverse only when an error impacts a party's substantial rights, asking whether there is a reasonable probability that, but for the error claimed, the result of the proceeding would have been different").

B.

Defendant next argues that the following general narrative by the prosecutor during closing argument improperly inflamed the jury's passions and impermissibly vouched for the police witnesses:

18

Imagine in February 2007 a family was traveling from somewhere in rural Kansas to visit Oklahoma City, to visit family, for a vacation, or maybe for business. And they had heard about the new Bricktown development with the restaurants and the canal and the ball yard and . . . looked up a motel room and found the Bricktown Suites. . . . And as they drove toward Oklahoma and as they drove down I-35 past Oklahoma City's downtown area, . . . they found their hotel. They exit the interstate, walked inside, and saw drug dealers, crack addicts and prostitutes. Shocking. Absolutely shocking. . . . But fortunately for us it wasn't shocking to one other group of people, for brave Oklahoma City Police Officers like Shawn Lindsey, who each and every night during the month of February made it their job to patrol those halls in an attempt to stop the drug trade, to stop the crime. And he would walk in, as he did on this occasion, alone, armed with a cross on his belt and a gun on his side, into the belly of the beast like a surgeon aiming for the cancer as he came across it.

*\*\**

And, more importantly, sometimes in this world, sometimes luck smiles on the good folks. As you heard how this case happened, Officer Lindsey that night got lucky and these guys just flat got caught.

*\*\**

A case arises most times because the community cries out and says to law enforcement, "We need help. We've got a problem and we feel helpless to do anything about it. We need you to come in and help us." And an officer, like Shawn Lindsey Sergeant Moon, Sergeant McKee, they answer the call. They arrive and they say, "People of the community, we will do everything we can to hold these people responsible, we'll do everything we can to give you piece [sic] of mind," and they do the job and they make the arrest and they catch the guys.

R., Tr. of Jury Trial, at 361- 62, 367, 373.[6]  At trial, Defendant did object to this

_____

[6] In his brief, Defendant also argues that this narrative encouraged the jury to convict him as part of their civic duty. Defendant's co-conspirator, Curtis Robertson, also made a civic duty argument on appeal to this court. Although we
(continued...)

19

narrative as improperly inflaming the jury's passions and vouching for the police witnesses.[7]  See id. at 374.  Because Defendant objected to this general narrative and the district court overruled the objection, our review is de novo.  See Taylor, 514 F.3d at 1098.

Our first task is to determine if the prosecutor's comments were improper.  Pulido-Jacobo, 377 F.3d at 1134.  We assume without deciding that the prosecutor

---

[6](...continued)
affirmed Robertson's conviction in United States v. Robertson,  2008 WL 4648277 (10th Cir. Oct. 22, 2008), we ruled that certain comments made by the prosecutor were improper because they were "tantamount to imploring the jury to convict as part of its civic duty."  Id. at *6; see also Wilson v. Sirmons, 536 F.3d 1064, 1120 (10th Cir. 2008) ("It is improper for a prosecutor to suggest that a jury has a civic duty to convict.").  However, the comments we determined to be an improper civic duty argument were the prosecutor's suggestion that the jury could "complete the circle" of the justice system and hold the defendants accountable.  Robertson, 2008 WL 4648277 at *6.  While Robertson specifically appealed the "complete the circle" comments, see Brief for Curtis Leroy Robertson at 20-21, United States v. Robertson, 2008 WL 4648277 (10th Cir. Oct. 22, 2008) (No. 07-6231), Defendant makes no mention of these remarks in his brief.  Accordingly, Defendant failed to appeal the remarks we held were "tantamount to imploring the jury to convict as part of its civic duty," Robertson,  2008 WL 4648277 at *6, and we consider Defendant's civic duty argument waived.  See Becker v. Kroll, 494 F.3d 904, 913 n.6 (10th Cir. 2007) (noting that an issue insufficiently raised in an opening brief is deemed waived).

[7] We do not believe the prosecutor's statements regarding the bravery of the police officers qualifies as vouching for the officers' testimony.  Nowhere in his closing argument does the prosecutor refer to the credibility of the police witnesses.  See, e.g., Thornburg v. Mullin, 422 F.3d 1113, 1132 (10th Cir. 2005) (noting that a prosecutor's comments were not vouching because the prosecutor never indicated he personally knew something more about the credibility of the witness); United States v. Carter, 953 F.2d 1449, 1461 (5th Cir. 1992) (noting that the prosecutor's praise of police officers' bravery did not imply independent knowledge of their truthfulness).

20

went too far in his remarks regarding the overall damage to the community inflicted by the drugs and prostitution at the hotel. Prosecutors are not permitted to incite the passions of the jury by suggesting they can act as the "community conscience" to society's problems. United States v. Solivan, 937 F.2d 1146, 1151 (6th Cir. 1991); see also id. at 1153 ("[G]overnment prosecutors are not at liberty to urge jurors to convict defendants as blows to the drug problem faced by society or specifically, within their communities."). "Appeals [by the prosecutor] about the need to address societal ills speak not to the question whether the accused committed the crime alleged, but divert attention from that dispositive question and confuse the task of the jury . . . with the task of elected officials." Taylor, 514 F.3d at 1095. Such dramatic proclamations can improperly threaten to inflame the passions of the jury. Malicoat v. Mullin, 426 F.3d 1241, 1256 (10th Cir. 2005) (noting that prosecutors may not use closing argument to inflame the passions of the jury).

Assuming the narrative was improper, we nonetheless believe that the prosecutor's comments were harmless beyond a reasonable doubt. See Pulido-Jacobo, 377 F.3d at 1134. First, as we have already discussed, the Government presented a very strong case against Defendant. See Malicoat, 426 F.3d at 1256 (noting that the strength of the state's case supported the conclusion that improper remarks aimed at inflaming the jury's passion did not constitute reversible error). Second, the large majority of the prosecutor's closing argument is supported in the record, including the nefarious nature of the hotel where Defendant was arrested.

21

See Pena, 930 F.2d at 1491 (recognizing that we are required to view "the improper remark[s] against the backdrop of the entire record before the jury"); Malicoat, 426 F.3d at 1256 (citing "the fact that the majority of the prosecutor's argument was based upon evidence in the record" in support of its conclusion that the prosecutor's improper remarks were not reversible error). Third, the jury was properly instructed that closing arguments are not evidence. See Almaraz, 306 F.3d at 1037 (noting that we presume the jury follows its instructions). Finally, the prosecutor's narrative was a small piece of a lengthy closing argument, and was simply not egregious enough "to influence the jury to convict on grounds other than the evidence presented." Gabaldon, 91 F.3d at 94.

## C.

Defendant also alleges the prosecutor's following statement damaged the presumption of innocence owed to Defendant:

> As you can see, ladies and gentleman, there simply aren't any real defenses under the law in this case. We've got a textbook example of how these drug operations work. And because there really are no defenses available and because the evidence is so clear, we're going to ask you at the end of this trial to hold these individuals responsible for what they've done.

R., Tr. of Jury Trial, at 372. Because Defendant never objected to this statement, we review for plain error only.

Regardless of the standard of review, however, Defendant's argument fails. The record demonstrates that one of Defendant's primary defenses was that he was

22

in the hotel suite only briefly (if at all), and that he was unaware of the drug trafficking activity. The prosecutor was simply stating that Defendant cannot explain away the evidence presented against him. Defendant stretches this statement far beyond its context or effect in suggesting that it somehow impairs the presumption of innocence. Moreover, the jury instructions used at trial are clear that the Government bears the burden of proof and that Defendant is not obligated to prove his innocence or produce any evidence in his favor. Again, we presume the jury follows its instructions. See Almaraz, 306 F.3d at 1037. We conclude, therefore, that this statement was not improper.

## VI.

Defendant's fifth and final argument is that cumulative-error by the district court requires reversal of his convictions. In situations involving "both preserved and unpreserved errors, cumulative-error analysis should proceed as follows: First, the preserved errors should be considered as a group under harmless-error review. If, cumulatively, they are not harmless, reversal is required." United States v. Caraway, 534 F.3d 1290, 1302 (10th Cir. 2008). If the preserved errors are cumulatively harmless, then "the court should consider whether those preserved errors, when considered in conjunction with the unpreserved errors, are sufficient to overcome the hurdles necessary to establish plain error." Id.

The purpose of cumulative error analysis "is to address whether the cumulative effect of two or more individually harmless errors has the potential to prejudice a

23

defendant to the same extent as a single reversible error." United States v. Harlow, 444 F.3d 1255, 1269 (10th Cir. 2006). We determine whether cumulative error is harmless "by conducting the same inquiry as for individual error—courts look to see whether the defendant's substantial rights were affected." Id. This review, however, is limited to "the effect of matters determined to be error, not the cumulative effect of non-errors." Id.

Here, we identified two possible errors: (1) an unpreserved error—the prosecutor's statement about the cross on Officer Lindsey's belt; and (2) a preserved error—the prosecutor's narrative about the general societal ills at issue in this trial. Thus, our inquiry is whether the combined effect of these statements can overcome plain error review. See Caraway, 534 F.3d at 1302. For the reasons we have already articulated—namely the minimal extent of the alleged misconduct associated with the prosecutor's statements, and the presence of mitigating factors at trial—we do not believe Defendant can demonstrate that these statements affected his substantial rights. After "[c]onsidering the record in its entirety including the prosecutor's statements, we conclude that Defendant received a fair trial—not a perfect trial, but overall a fair one." Gabaldon, 91 F.3d at 95.

For the foregoing reasons, we **affirm** Defendant's convictions on all counts.