**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**September 22, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

EDDIE WHITE, JR.,

    Defendant - Appellant.

No. 23-3122
(D.C. No. 2:19-CR-20055-HLT-1)
(D. Kan.)

_____

**ORDER AND JUDGMENT***
_____

Before **HARTZ**, **EBEL**, and **ROSSMAN**, Circuit Judges.
_____

In this direct criminal appeal, Defendant Eddie White, Jr., challenges his

conviction for being a previously convicted felon unlawfully in possession of a

firearm. Having jurisdiction under 28 U.S.C. § 1291, we AFFIRM.

## I. BACKGROUND

Viewed in the light most favorable to the jury's verdict, see United States v.

Chapman, 839 F.3d 1232, 1235 (10th Cir. 2016), the evidence at trial indicated the

following: Mid-morning on May 8, 2018, police responded to reports of gunfire in a

Kansas City, Kansas, residential neighborhood. Mr. White's mother lived in an

---

* This order and judgment is not binding precedent, except under the doctrines of law
of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

apartment in that neighborhood and he sometimes stayed with her. Responding officers drove past two unoccupied vehicles, a silver Mercedes parked on one side of Brown Avenue and a purple Dodge Charger stopped across the street from the Mercedes, both with bullet holes. The Mercedes belonged to Mr. White and the purple Charger had recently been stolen in a carjacking.

The officers noticed a fast-moving white car travelling down Brown Avenue toward a dead end. They followed that car, which Mr. White's mother was driving, but did not activate their lights or siren. One of the officers, Caiharr, testified that, as they reached the dead end, he saw two men in a field who turned out to be Mr. White and Frederick Clark. When the two men saw the patrol car, they ran in opposite directions. As Mr. White ran in front of the officers, he dropped a gun—a fully loaded Glock nine millimeter pistol with an extended magazine. Officer Caiharr pursued Mr. White into a nearby backyard and arrested him. Other officers found and arrested Mr. Clark, as well as a third man, Dahrell Johnson. Neither Mr. Clark nor Mr. Johnson had a gun, but Mr. Clark had the keys to the stolen purple Charger. Police found an empty mini-Draco pistol in a nearby open grassy area. Mr. White's DNA was found on the triggers and other areas of both the Glock and the mini-Draco.

After his arrest, officers took Mr. White to the police station where Detective Miller interviewed him. At the outset of the interview, Detective Miller gave Mr.

White <u>Miranda</u>[1] warnings, verbally and in writing, informing him that he had the right to remain silent; anything he said could be used against him in court; he had the right to an attorney and to have the attorney present during questioning; if he could not afford an attorney, one would be appointed for him before questioning; and he could invoke these rights at any time and not answer any questions.  After receiving and acknowledging his <u>Miranda</u> warnings, Mr. White agreed "to say just a little bit." (II Supp. R. Gov't Ex. 146 at 15:23:02.)  That interview lasted over forty-five minutes and was video recorded.

During the interview, Mr. White told the detective that the shooting that day stemmed from an ongoing dispute between Mr. White and another person, whom Mr. White declined to identify.  According to Mr. White, five months earlier, on New Year's Eve, somebody who was with Mr. White's adversary twice shot Mr. White in the foot.  After that New Year's Eve shooting, the person with whom Mr. White had the dispute, and that person's acquaintances, had continually harassed and threatened Mr. White and his family.  About the May 8 incident, Mr. White speculated, "I guess this particular time they just shot again.  This is what led me here."  (<u>Id.</u> at 15:25:34–15:25:51.)  Although he indicated that he saw the guy who shot at him on May 8, Mr. White declined to identify him.  Mr. White also declined to identify the person who had shot him on New Year's Eve.  Mr. White told the detective that, if he identified any of these men, he would be killed.

---

[1] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

Mr. White also declined to say whether he had a gun on that day, May 8. But he told the detective,

> I got shot two times. Do you think a person that got shot is not going to have some kind of gun whether he is supposed to have one or not? Somebody tried to take my life. I can't call on the police. What am I supposed to do, just stand there and die?

(Id. at 15:46:34–15:46:48.) Mr. White further told the detective, "I'm not letting somebody shoot me again. . . . If I have to go to jail or whatever. I'm not about to let somebody kill me bro and that's where I'm at with it." (Id. at 15:53:36–15:53:46.)

The detective told Mr. White several times during the interview that, if Mr. White did have a gun on May 8, there might be an explanation for why he had that gun—perhaps Mr. White had acted in self-defense—and that now was the time to tell the detective. Mr. White responded that he was not going to incriminate himself or anyone else, but "we definitely wasn't the aggressors." (Id. at 15:51:44–15:51:42.)

During the forty-five-minute interview, Mr. White never asked for an attorney and never indicated that he wanted to stop answering questions. It was the detective, not Mr. White, who ended the interview.

As a result of the May 8 incident, the United States charged Mr. White with violating 18 U.S.C. § 922(g)(1) by being a previously convicted felon unlawfully in possession of a firearm—specifically the Glock nine millimeter pistol that Mr. White dropped as he ran in front of the patrol car. At trial, the Government presented undisputed evidence establishing the elements that the jury had to find to convict Mr. White of that offense. See United States v. Mayfield, 134 F.4th 1101, 1107–08 (10th

4

Cir. 2025) (discussing elements of § 922(g)(1) offense), petition for cert. filed, (U.S. July 17, 2025) (No. 25-5141). Mr. White acknowledged that he possessed the Glock on May 8, but in his defense, Mr. White asserted that he possessed the firearm under duress. See United States v. Butler, 485 F.3d 569, 572 & n.1 (10th Cir. 2007) (addressing elements of affirmative defense known interchangeably as duress, necessity or justification).

Anticipating Mr. White's defense, the Government presented evidence in its case in chief to support its theory of the May 8 shooting—that Mr. White and Mr. Clark ambushed Mr. Johnson. The Government also played for the jury Detective Miller's recorded post-arrest interview with Mr. White, in its entirety and without objection.

After the Government rested its case, Mr. White, in support of his duress defense, testified to the following: On May 8, 2018, he was sitting in the front passenger seat of his Mercedes, which was parked on Brown Avenue, cleaning the car out. Someone with a gun, probably accompanied by another person, came up to him from behind and tried to carjack Mr. White's car. The carjacker ordered Mr. White out of the car, took everything out of Mr. White's pockets, and then threw Mr. White onto the ground. Mr. White never saw the carjacker's face. While he was lying on the ground, Mr. White heard shooting. When it stopped, Mr. White ran toward some nearby trees and bushes, jumped a fence and hid in the brush. While hiding, he heard more shooting coming from Brown Avenue, as well as screeching tires and a crash. Someone then jumped over the fence near where Mr. White was

hiding, dropped the Glock and kept running. Mr. White did not see that person's face. Two to three minutes later, someone tossed or dropped the mini-Draco pistol over the same fence before jumping over the fence himself. As that person reached to pick up the mini-Draco, he saw Mr. White hiding. The two men wrestled for the mini-Draco until the other man gained control of the gun and flung it off to the side. Both men then reached for the Glock that was lying on the ground. Mr. White got to the Glock first, grabbed it and ran away. As he ran through a field toward Brown Avenue, Mr. White saw a patrol car. He dropped the Glock so the police would not think he was the shooter and then continued running in order to distance himself from the gun so that the officers did not deem him to be a threat to them.

Mr. White did not see anyone else in the open field he crossed while running toward Brown Avenue. Further, he does not know Mr. Clark and did not see anyone who looked like him during the incident. Mr. White also explained that when he told Detective Miller, during the recorded post-arrest interview, that "we wasn't the aggressors," he was just responding to the way the detective framed the hypothetical question, asking, if you were with someone, were you the aggressor.

In closing argument, the prosecutor argued to jurors, among other things, that during the post-arrest interview, Detective Miller suggested Mr. White might have been acting in self-defense and gave him an opportunity to tell the detective what happened. "And what Eddie White tells him is not what he told you here today." (III R. 683.) The prosecutor went through the inconsistencies between what Mr. White said during his post-arrest interview and what he testified to at trial, and then

6

asserted, "what he told you here today, there's nothing incriminating about that. If it happened that way, there's nothing incriminating. He has every incentive in the world to tell Detective Miller that it happened the way he told you today if it happened that way." (Id. at 686.) The prosecutor made a similar argument during rebuttal closing. The jury convicted White of being a previously convicted felon unlawfully in possession of a firearm and the district court sentenced him to 120 months in prison.

## II. DISCUSSION

Mr. White contends that the prosecutor, at trial, improperly questioned Detective Miller and Mr. White about Mr. White's partial silence during the post-arrest post-Miranda interview regarding whether he possessed a firearm on May 8, and unfairly used that partial silence during closing argument to impeach Mr. White's trial testimony. Mr. White further asserts that the prosecutor misstated the evidence during closing argument. Mr. White acknowledges that, because he did not raise any of these contentions at trial, we review them on appeal for plain error. See Fed. R. Crim. P. 52(b); see also United States v. Ward, 135 F.4th 1265, 1268 (10th Cir. 2025). As we explain next, Mr. White has failed to establish that any plain error occurred at his trial that warrants relief.[2]

---

[2] Mr. White seeks to preserve an additional argument: that 18 U.S.C. § 922(g)(1), the statute under which he was charged and convicted, violates the Second Amendment. He acknowledges, however, that this court has previously rejected that argument in Vincent v. Bondi, 127 F.4th 1263, 1264–66 (10th Cir. 2025), petition for cert. filed, (U.S. May 12, 2025) (No. 24-1155).

7

**A. The prosecutor's challenged questions and argument about Mr. White's post-arrest, post-<u>Miranda</u> partial silence do not warrant relief**

Mr. White first contends that the prosecutor deprived him of due process by unfairly using his post-arrest, post-<u>Miranda</u> partial silence regarding whether he possessed a firearm on May 8 to challenge the credibility of Mr. White's trial testimony.

**1. Relevant law**

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const., amend. V.  In order to protect this privilege against self-incrimination, the Supreme Court, in <u>Miranda</u>, held that

> the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless[,] . . . [p]rior to any questioning, the person . . . [is] warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. . . . [I]f the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned.

384 U.S. at 444–45.

In <u>Doyle v. Ohio</u>, the Supreme Court held that the government deprived the defendant in that case of due process when it used his silence, occurring after police took the defendant into custody and gave him <u>Miranda</u> warnings, to impeach the

defendant's trial testimony.  426 U.S. 610, 611, 619 (1976).  "[I]t would be fundamentally unfair and a deprivation of due process" to advise a suspect at the time he was arrested that he had the right to remain silent but then "to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." Id. at 618.

On the other hand, the Supreme Court has held that, when a defendant, after being arrested and given Miranda warnings, makes statements, it is not fundamentally unfair to offer those statements to impeach the defendant's inconsistent trial testimony.  See Anderson v. Charles, 447 U.S. 404, 408–09 (1980) (per curiam).  In Anderson, police arrested the defendant, Charles, while he was driving a murder victim's stolen car.  Id. at 404.  After his arrest and after receiving Miranda warnings, Charles told police that he had stolen the car at a particular intersection two miles from the bus station.  Id. at 405.  At his trial for murder, however, Charles testified instead that he had stolen the car from a parking lot right next to the bus station.  Id. at 404–05.  The Supreme Court held that it was not fundamentally unfair for the prosecutor to impeach Charles at trial by asking him why he had not told police that story when he was arrested.  Id. at 405–09.

> Doyle does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving Miranda warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all. . . .
>
>        . . . .

9

. . . The questions [at Charles' trial] were not designed to draw meaning from silence, but to elicit an explanation for a prior inconsistent statement.

. . . Each of two inconsistent descriptions of events may be said to involve "silence" insofar as [one] omits facts included in the other version. But Doyle does not require any such formalistic understanding of "silence."

Id. at 408–09.

Applying Doyle and Anderson, the Tenth Circuit, in a more "complicated" situation, United States v. Canterbury, 985 F.2d 483, 486 (10th Cir. 1993), has recognized that a suspect in custody post-Miranda who remains partially silent—that is, who answers some questions while remaining silent as to other topics—can assert that a Doyle error occurred at trial when the prosecutor asked him about matters about which he chose to remain silent during the post-arrest interview. See United States v. Harrold, 796 F.2d 1275, 1279 n.3 (10th Cir. 1986); see also, e.g., Ward, 135 F.4th at 1266–70 (citing Canterbury, 985 F.2d at 484–86); United States v. May, 52 F.3d 885, 889–90 (10th Cir. 1995).[3]

In Canterbury and Ward, for example, the defendants told the same inculpatory story both in a post-arrest, post-Miranda interview and at trial. But at trial, the

---

[3] In some of this circuit's "partial silence" cases, an arrested and Mirandized suspect answered some questions but expressly declined to answer other questions officers posed to him. See Harrold, 796 F.2d at 1278 & n.2. In other "partial silence" cases, like Canterbury and Ward, the arrested and Mirandized suspect answered some questions but never mentioned or addressed an affirmative defense that the suspect later asserted for the first time at trial. This court held in those cases that the defendant can assert a Doyle violation under those circumstances. See Ward, 135 F.4th at 1266–70; Canterbury, 985 F.2d at 484–86.

defendants also, for the first time, asserted an affirmative defense. In those cases, this court held it was fundamentally unfair for the prosecution to use the defendants' post-arrest, post-Miranda silence as to their affirmative defenses to impeach their trial testimony in support of those defenses. See Ward, 135 F.4th at 1266–70; Canterbury, 985 F.2d at 484, 486.

On the other hand, where a defendant, after his arrest and after receiving Miranda warnings, does not invoke his right to remain silent but instead tells police a story that differs from his later trial testimony, we have held that the prosecutor does not violate Doyle if he points out for the jury inconsistencies between the defendant's two stories. See May, 52 F.3d at 889 (noting that the "record indicates that May never formally invoked his right to remain silent," but was instead "forthcoming with information and simply chose to tell various versions of his 'story' when speaking to the authorities"); see also id. at 889–90 (holding, alternatively, that "even if it can be said that May partially invoked his right to remain silent, the prosecutor's comments do not constitute a violation of May's due process rights" because they focused on the inconsistencies in May's stories rather than on his partial silence); Twyman v. Oklahoma, 560 F.2d 422, 423–24 (10th Cir. 1977) (per curiam) (holding, in habeas case, that there was no Doyle error where Twyman, after his arrest and after receiving Miranda warnings, gave "a detailed accounting of his recent activities, including his association with the murder victim," and then "chose to testify at trial where he again gave a purportedly full and detailed accounting of his activities," including for the first time telling about his "procurement of what apparently was the

11

murder weapon," thus "open[ing] himself up to full cross-examination, the same as any other witness").

Thus, our prior precedent indicates that, when a defendant, after being arrested and receiving Miranda warnings, remains partially silent, the prosecutor may comment on inconsistencies between the defendant's post-Miranda statements and his trial testimony, but the prosecutor may not use the defendant's partial silence to impeach the defendant's trial testimony. See May, 52 F.3d at 889–90. To determine whether a Doyle error involving a defendant's partial post-Miranda silence has occurred, we consider the prosecutor's challenged questions or comments at trial in context to decide "whether the cross-examination was designed to impeach the defendant's trial testimony by calling attention to prior inconsistent statements or, instead, was designed to suggest an inference of guilt from the defendant's post-arrest silence." May, 52 F.3d at 890 (citing Canterbury, 985 F.2d at 486). The test, then, "for determining if there has been an impermissible"

> comment on a defendant's right to remain silent at the time of his arrest is "whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment" on the defendant's right to remain silent.

Id. (quoting United States v. Mora, 845 F.2d 233, 235 (10th Cir. 1988), in turn quoting United States v. Morales-Quinones, 812 F.2d 604, 613 (10th Cir. 1987)). With these general principles in mind, we turn to the specific facts of this case.

**2. Mr. White failed to establish plain <u>Doyle</u> error that affected his substantial rights**

Because Mr. White did not assert any <u>Doyle</u> error at trial, we review for plain error the <u>Doyle</u> violations he now asserts for the first time on appeal. <u>See</u> Fed. R. Crim. P. 52(b); <u>see also</u> <u>Ward</u>, 135 F.4th at 1268. To obtain relief, therefore, Mr. White "must 'demonstrate: (1) an error, (2) that is plain, which means clear or obvious under current law, and (3) that affects substantial rights.'" <u>United States v. Moore</u>, 96 F.4th 1290, 1299 (10th Cir. 2024) (quoting <u>United States v. Rosales-Miranda</u>, 755 F.3d 1253, 1258 (10th Cir. 2014)). An error affects substantial rights if there is a reasonable probability that, but for the error, the outcome of the trial could have been different. <u>See</u> <u>Mayfield</u>, 134 F. 4th at 1107. If the defendant "satisfies these criteria, this Court may exercise discretion to correct the error if (4) it seriously affects the fairness, integrity, or public reputation of judicial proceedings." <u>Moore</u>, 96 F.4th at 1299–1300 (quoting <u>Rosales-Miranda</u>, 755 F.3d at 1258). We apply plain-error review "less rigidly when reviewing a potential constitutional error." <u>United States v. Miller</u>, 891 F.3d 1220, 1231 (10th Cir. 2018) (quoting <u>United States v. James</u>, 257 F.3d 1173, 1182 (10th Cir. 2001)).

**a. Mr. White has not established plain <u>Doyle</u> error**

We will assume, without deciding, that there was <u>Doyle</u> error in this case. But we cannot say that that error was plain; that is, that it was "clear or obvious under current law." <u>Moore</u>, 96 F.4th at 1299 (quoting <u>Rosales-Miranda</u>, 755 F.3d at 1258).

13

This case arguably falls in the middle of our prior cases, some finding Doyle error, some not. This case is not exactly like Ward and Canterbury, where we found Doyle error. In those cases, the defendants gave the same inculpatory story, both after their arrest and at trial, but for the first time asserted an affirmative defense at trial. See Ward, 135 F.4th at 1266–70; Canterbury, 985 F.2d at 484–86. Mr. White also asserted an affirmative duress defense for the first time at trial. But, different than the defendants in Ward and Canterbury, Mr. White also gave inconsistent stories during his post-arrest interview and at trial. In his post-arrest interview, he stated that on May 8 he was shot by a member of a group of people who had previously shot him and with whom he had had a running months' long dispute. At trial, on the other hand, he testified that the May 8 shooting was the result of an attempted carjacking by unknown assailants. Generally, a prosecutor can point out such inconsistent statements to jurors.

This case, however, is also not exactly like our prior cases finding no Doyle error where the defendants, in a post-arrest, post-Miranda interview did not invoke their right to remain silent but instead simply told police a story that differed from their later trial testimony. See May, 52 F.3d at 889–90; Twyman, 560 F.2d at 424. Here, Mr. White, after being told he had a right to remain silent, expressly told the detective during the post-arrest interview that he was not going to discuss whether he had a gun on May 8. At trial, for the first time, he acknowledged having a gun and asserted an affirmative defense for why he possessed that weapon.

14

This case, then, arguably falls in the middle of our prior cases, some finding Doyle error, some not. For that reason, it presents a close call. In light of that, Mr. White has not established plain error; that is, error was "clear or obvious under current law." Moore, 96 F.4th at 1299 (quoting Rosales-Miranda, 755 F.3d at 1258).

In that respect, this case is similar to United States v. Pemberton, No. 99-2233, 2000 WL 912741 (10th Cir. July 7, 2000) (unpublished).[4] Pemberton shot and killed the victim after Pemberton and the victim had been drinking heavily at Pemberton's home and the victim became belligerent and physically aggressive towards Pemberton. Id. at *1. During post-arrest, post-Miranda questioning, Pemberton indicated that the victim had pushed Pemberton around, would not leave Pemberton's home, and physically attacked Pemberton, causing Pemberton to have to defend himself. Id. at *4–5. "After completing [a] brief [post-arrest] written statement, Pemberton indicated that he did not want to continue the interview" and the officer "ceased his questioning." Id. at *2. At trial, Pemberton, for the first time, asserted that the victim had a knife with which he had threatened to kill Pemberton and Pemberton's school-age son who was asleep in the house, and that when Pemberton shot the victim, Pemberton thought the victim was coming at him with the knife. Id. at *1–2. On appeal, Pemberton asserted Doyle error based on the prosecutor's questioning and argument impeaching Pemberton's trial testimony with the fact that Pemberton had not mentioned that the victim had a knife during his post-arrest,

---

[4] Although not binding precedent, we find Pemberton's reasoning persuasive.

15

post-<u>Miranda</u> interrogation.  <u>Id.</u> at *4.  Reviewing for plain error, <u>id.</u>, this court held

that any <u>Doyle</u> error that occurred in that case was not plain:

> The plain error standard of review requires that the mistake be an obvious one (i.e., "plain"). In the present case, however, it is not obvious that the defendant's failure to mention previously such an important fact is actually consistent with his subsequent testimony. Although incomplete, [Pemberton]'s post-arrest statements do contain some degree of detail suggesting that he would have mentioned the knife had it actually been present. . . . It was, consequently, at least a matter of some ambiguity whether [Pemberton]'s trial testimony was inconsistent with these prior statements and therefore impeachable. Thus, any error committed by the prosecution in referring to [Pemberton]'s failure to mention the knife in his post-arrest statements was not plain.

<u>Id.</u> at *5.

Pemberton's reasoning applies here as well.  Whether Mr. White remained

partially silent during his post-arrest, post-<u>Miranda</u> interview about if, and how, he

possessed the Glock on May 8, is a close question.  He expressly told the detective he

would not address whether he had a gun on May 8.  But he hinted that he did have

one.  That close question is tied up in Mr. White's clearly inconsistent statements

about the circumstances underlying the shooting.  Because whether there was <u>Doyle</u>

error is such a close question, any such error cannot be deemed plain.

Our conclusion is further bolstered by the fact that almost all of the

prosecutor's questions and comments that Mr. White now challenges on appeal

addressed the inconsistencies between Mr. White's stories rather than his partial

silence on the limited question of whether he possessed a gun.  There is really only a

single challenged question that can be characterized as comment on Mr. White's

16

partial silence about whether he possessed the Glock on May 8.  As the prosecution

played the recorded post-arrest interrogation, the prosecutor asked Detective White:

> Q. . . . You just said to him – – you're about to explain a cycle of violence
> to him; correct?
>
> A. Correct.
>
> Q. And you say to him, "You have to carry a gun possibly"?
>
> A. Correct.
>
> Q. Did he ever say, "I didn't carry a gun"?
>
> A. Never said it.

(III R. 539.)  All of the other questions and argument that Mr. White challenges on

appeal involved instead only whether Detective Miller gave Mr. White an

opportunity to tell his carjacking story during the post-arrest, post-Miranda interview.

For all of these reasons, we conclude that, if there was Doyle error, it was not

plain; that is, "clear or obvious under current law."  Moore, 96 F.4th at 1299 (quoting

Rosales-Miranda, 755 F.3d at 1258).

### b.  Even if there was plain Doyle error, it did not affect Mr. White's substantial rights

Even if we could say that there was plain Doyle error, Mr. White has not

shown that the error affected his substantial rights; that is, Mr. White has not

established that, but for the Doyle error, the jury would have acquitted him of

unlawfully possessing the Glock.  See Mayfield, 134 F.4th at 1107.  To the extent

such plain Doyle error was based on the prosecutor pointing out, through questioning

and argument, that Mr. White had an opportunity to raise his carjacking defense

17

during the post-arrest, post-<u>Miranda</u> interview but failed to do so, that point was already made abundantly clear to jurors when the Government played the recorded interview for the jury in its entirety, without objection. During that recorded interview, Detective Miller, at least three different times, told Mr. White that, if he had a defense for his possessing a firearm on May 8, Mr. White should tell the detective at that time. Notwithstanding the detective's prompting, Mr. White did not tell the detective about the attempted carjacking. Because the jury viewed the unobjected-to recording of that interview, we cannot say that any further questions or argument from the prosecutor about the opportunity Mr. White had to tell the detective about the attempted carjacking on the day he was arrest would have changed the outcome of the trial.

Lastly, we cannot say that without the single comment that we flagged earlier as possibly <u>Doyle</u> error—when the prosecutor asked Detective Miller if Mr. White ever told him he did not possess a firearm on May 8, and the detective responded that Mr. White never told the detective that he had not possessed the Glock on May 8— the jury would have acquitted Mr. White. Mr. White, therefore, has not established that, but for any <u>Doyle</u> error that may have occurred at his trial, there is a reasonable probability that the jury would have been persuaded by his affirmative defense and acquitted him of unlawfully possessing a firearm.

### 3. Conclusion as to <u>Doyle</u> arguments

For all of these reasons, Mr. White has not raised plain <u>Doyle</u> error warranting relief.

## B. Any misstatement of the evidence during closing argument does not warrant relief

Mr. White next asserts that the prosecutor misstated the evidence during his closing argument.[5]  Because Mr. White did not object to this argument at trial, we again review for plain error.  <u>See</u> Fed. R. Crim. P. 52(b); <u>see also</u> <u>United States v. Sweet</u>, 107 F.4th 944, 961 (10th Cir. 2024), <u>cert. denied</u>, 145 S. Ct. 1221 (2025).  In reviewing prosecutorial-misconduct claims for plain error, the Tenth Circuit has condensed the usual four-step plain-error inquiry into two, asking whether "(1) the prosecutor's statement is plainly improper" and, if so, whether "(2) the defendant demonstrates that the improper statement affected his or her substantial rights." <u>United States v. Vann</u>, 776 F.3d 746, 759 (10th Cir. 2015) (quoting <u>United States v. Fleming</u>, 667 F.3d 1098, 1103 (10th Cir. 2011), and citing <u>United States v. Ivy</u>, 83 F.3d 1266, 1288 (10th Cir. 1996)).  In conducting this two-step inquiry, we view the challenged "remarks in the context of the entire trial."  <u>Id.</u> at 760 (quoting <u>United States v. Lopez-Medina</u>, 596 F.3d 716, 738 (10th Cir. 2010)).  "[R]eversal in the absence of contemporaneous objection is a rare exception rather than the rule."  <u>Id.</u> at

---

[5] As part of this argument, Mr. White reasserts that the prosecutor improperly commented during closing argument about his post-arrest, post-<u>Miranda</u> partial silence as to whether he possessed a firearm on May 8.  We reject that argument for the reasons stated in the preceding section of his opinion addressing the purported <u>Doyle</u> errors.

19

759 (quoting <u>United States v. Hill</u>, 749 F.3d 1250, 1267 (10th Cir. 2014)).  And when, as in this case, "'the jury was properly instructed that statements and arguments of counsel are not evidence and that defendant could only be convicted on the basis of evidence submitted at trial,' . . . we have consistently refused to find plain error based on misstatements by the prosecutor."  <u>Id.</u> at 760 (quoting <u>United States v. Rogers</u>, 556 F.3d 1130, 1140–41 (10th Cir. 2009)) (alterations omitted).

Mr. White asserts that the prosecutor plainly erred during his closing argument by misstating responding Officer Caiharr's testimony about seeing Mr. White and Mr. Clark in the open field soon after the reported gunfire.  Specifically, Officer Caiharr testified that the responding officers followed a white car, driven by Mr. White's mother, toward a dead end on Brown Avenue.  As the officers reached the dead end, Officer Caiharr saw two black males (later identified as Mr. White and Mr. Clark) in a field.  The prosecutor asked the officer if the two men "appear[ed] to be together?"  (III R. 136.)  The officer responded,

> I don't know if they appeared to be together or not.  They were in the . . . same field and . . . when they saw my vehicle and I saw them, I think it all happened at the same time and they each ran [in] different directions. I don't know if they were – – what they were doing.

(<u>Id.</u>)

During closing argument, the prosecutor asserted:

> And what did Officer Caiharr tell you?  I followed the [white] Cobalt [car] down.  Well, Eddie White sees his mother, is going to start walking out and then, lo and behold, he and Frederick Clark see a patrol vehicle.  And they're together, not what Eddie White told you.  He doesn't want them to be together - - that he doesn't want to be with Frederick Clark, but that's what Officer Caiharr saw.

20

(Id. at 681.)  In his rebuttal closing, the prosecutor again referred to Mr. White and

Mr. Clark in the clearing:

> These individuals, I think the evidence would suggest, are waiting for Eddie White's mother.  [Officer Caiharr] sees two individuals there.  He sees who we know is Frederick Clark and who we know is Eddie White and they're together.
>
> When I asked Mr. White, "Was there any individual around you?" "No.  None."  [Defense counsel's] theory is Frederick Clark is foe to Mr. White.  He's . . . one of the people chasing Mr. White.  No, he's not.  He's friend.  He's there with Mr. White.
>
> . . . And Mr. White was adamant, I'm not with – – there's nobody there.  He has to say that.  That's a lie unless you believe Officer Caiharr didn't see what he told you he saw.

(Id. at 708.)

Even if we could say that the prosecutor plainly erred by misstating Officer

Caiharr's testimony, Mr. White has not shown that there is a reasonable probability

that, absent this brief misstatement, the result of the trial would have changed.  See

United States v. Burgess, 99 F.4th 1175, 1190 (10th Cir. 2024).

## C.  There is no cumulative error warranting relief

Lastly, Mr. White argues that, even if there was error that did not, by itself

require reversing his conviction, the errors were prejudicial when considered

cumulatively.  We reject that argument.  "For cumulative error, . . . we include only

preserved errors and unpreserved errors that are plain."  United States v. Lopez, 131

F.4th 1114, 1136 (10th Cir. 2025).  Mr. White asserted only unpreserved errors on

appeal and the only two that might possibly be plain error were the prosecutor asking

21

Detective Miller if Mr. White ever told the detective, during the post-arrest, post-Miranda interview, that he did not have a gun, and the prosecutor's misstating Officer Caiharr's testimony during closing argument. Mr. White "has failed to carry his burden of establishing that these [possible] errors cumulatively affected the jury's decision in his case, as required for relief." United States v. Little, 119 F.4th 750, 786 (10th Cir. 2024), petition for cert. filed, (U.S. July 2, 2025) (No. 25-5015).

## III. CONCLUSION

We AFFIRM Mr. White's conviction.

Entered for the Court

David M. Ebel
Circuit Judge