**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 18 2004**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

EVERETT GEROD JACKSON,

Defendant-Appellant.

No. 03-2260

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CR-03-771-JC)**

---

Thomas B. Jameson, Assistant Federal Public Defender, Albuquerque, New Mexico, for Defendant-Appellant.

Norman Cairns, Assistant United States Attorney (David C. Iglesias, United States Attorney, with him on the briefs), for Plaintiff-Appellee.

---

Before **TACHA**, Chief Circuit Judge, **LUCERO**, and **MURPHY**, Circuit Judges.

---

**MURPHY**, Circuit Judge.

## I. INTRODUCTION

Defendant-appellant Everett Gerod Jackson was indicted in the United States District Court for the District of New Mexico for possession with intent to distribute five-hundred or more grams of cocaine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B) and 18 U.S.C. § 2. Jackson filed a motion to suppress all the evidence discovered during his March 24, 2003 encounter with a Drug Enforcement Agency ("DEA") agent. The district court denied the motion. Jackson entered a conditional guilty plea to possession with intent to distribute less than five-hundred grams of cocaine in violation of 21 U.S.C. § 841(a) and (b)(1)(C). He was sentenced to fifty-seven months' imprisonment.

Jackson appeals the denial of his motion to suppress. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, this court **affirms** Jackson's conviction.

## II. BACKGROUND

On March 24, 2003, DEA agent Jarrell Perry obtained a Passenger Name Record ("PNR") from Amtrak which showed that Jackson had paid cash for a one-way coach train ticket from Los Angeles, California to Akron, Ohio. Perry testified that, based on his experience, he determined that Jackson's travel arrangements were consistent with those of drug couriers. As a consequence, Perry approached Jackson on the Amtrak train when it stopped in Albuquerque,

-2-

New Mexico.  Perry identified himself as a DEA agent.  Perry asked Jackson if he would speak to him, and Jackson replied that he would.  Perry asked Jackson if he was carrying any contraband.  Jackson replied that he was not.  Perry asked Jackson for consent to search his bag for contraband, including narcotics.  Jackson said "yes."

Inside Jackson's bag, Perry found a shaving kit.  Within the kit was a container of baby powder which bulged and appeared heavier and harder than normal baby powder containers.  Perry knew of other drug interdiction cases in which baby powder containers were used to conceal powdered cocaine and methamphetamine.  Perry asked Jackson two or three times if he owned the baby powder container, but Jackson did not respond.  Perry could not look inside the baby powder container without opening its top.

Perry had a Leatherman tool whose blade he kept clean, albeit not surgically clean.  Perry easily removed the lid with his Leatherman tool.  The container was filled with powder, some of which spilled onto the floor.[1]  Perry inserted the blade of his Leatherman tool into the baby powder container and felt something hard.  Perry moved some of the baby powder aside with the blade and saw a clear plastic bag hidden inside the container.  Perry testified that he saw a

---

[1]Close to one tablespoon of baby powder was lost as a result of the initial spillage and Perry's subsequent insertion of his knife into the container.  The baby powder container had a twenty-two ounce capacity.

white substance inside the submerged bag. The color and texture of the substance was consistent with that of powdered cocaine. Perry testified that although he "didn't know for sure what was inside [the] baggy," based on his training and experience he believed that the plastic bag held narcotics. Perry testified that he thought it was "very unlikely" that the inner bag contained something other than narcotics. Throughout these events, Jackson stood a few feet from Perry, quietly looking straight ahead.

Perry arrested Jackson and easily placed the lid back onto the container. Jackson and the container were taken to the DEA's office. At the office, Perry cut off the top section of the baby powder container in order to remove the plastic bag. The plastic bag was heat-sealed and contained another clear plastic bag. The inner bag held the white powder. This method of packaging is consistent with that used to smuggle narcotics. The plastic bag contained approximately five-hundred grams of cocaine.

At the suppression hearing, the district court examined the baby powder container. It found that despite Perry's search, the lid could be placed back onto the container and the container then worked as before. The court also found that the loss of some of the baby powder from spillage was *de minimis*. It found that Perry's search of the baby powder container was within the boundaries of Jackson's consent.

## III. DISCUSSION

In reviewing the denial of a motion to suppress, this court views the evidence in light most favorable to the government and accepts the district court's findings of fact unless clearly erroneous. *United States v. Marquez*, 337 F.3d 1203, 1207 (10th Cir. 2003). The district court's conclusion that a search is within the boundaries of a defendant's consent is a factual finding that this court reviews for clear error. *United States v. Pena*, 143 F.3d 1363, 1368 (10th Cir. 1998). The ultimate determination of reasonableness under the Fourth Amendment, however, is reviewed *de novo*. *Marquez*, 337 F.3d at 1207.

### A.    Scope of Consent

The events which took place in the train did not violate Jackson's Fourth Amendment rights. The Fourth Amendment typically requires that law enforcement agents obtain a warrant before conducting a search. *Pena*, 143 F.3d at 1365-66. A warrant is not required, however, when the defendant consents to the search. *Id.* "When law enforcement officers rely upon consent to justify a warrantless search, the scope of the consent determines the permissible scope of the search." *Marquez*, 337 F.3d at 1207. Jackson consented to the search of his carry-on bag. He argues, however, that the search of the baby powder container in the train violated his Fourth Amendment rights because it exceeded the scope of his consent.

The search of the baby powder container was within the scope of Jackson's consent to the search of his bag. The search of a container does not exceed the scope of consent when, under the circumstances of the particular case, it was objectively reasonable for the officer to believe that the scope of the suspect's consent permitted him to open the container. *Marquez*, 337 F.3d at 1207; *see also Pena*, 143 F.3d at 1367-68. A defendant's failure to limit the scope of a general authorization to search, and failure to object when the search exceeds what he later claims was a more limited consent, is an indication that the search was within the scope of consent. *Marquez*, 337 F.3d at 1208-09. The district court found that the search of the baby powder container was within the boundaries of Jackson's consent. This finding is supported by the record. Agent Perry told Jackson that he wanted to search the bag for narcotics. Jackson's consent to the search of his bag for narcotics could be reasonably construed as consent to search any containers within the bag which could have held narcotics, such as the baby powder container. *See id.* at 1208; *United States v. Ramstad*, 308 F.3d 1139, 1146-47 (10th Cir. 2002) (noting that where officer has indicated his intent to search for drugs or contraband, a suspect's consent "certainly implies that the officer could look wherever drugs might be hidden"). Furthermore, Jackson was standing near Perry throughout the search but yet remained silent and did not

-6-

object to the search of the baby powder container. Under such circumstances, the search of the baby powder container was within the scope of Jackson's consent.

Moreover, removing the lid of the baby powder container did not exceed the scope of Jackson's consent because it did not destroy or render the container useless. "[B]efore an officer may actually destroy or render completely useless a container which would otherwise be within the scope of a permissive search, the officer must obtain explicit authorization, or have some other, lawful, basis upon which to proceed." *United States v. Osage*, 235 F.3d 518, 522 (10th Cir. 2000). The district court examined the baby powder container. It found that the lid could be placed back onto the container and that the container worked properly. The container was neither destroyed nor rendered useless by Perry's search, as it remained capable of "performing its designated function." *Id.* at 521. Likewise, any loss or contamination of the baby powder by Perry's search with his blade was *de minimis* and well short of the type of "complete and utter destruction or incapacitation" that was the focus of our concern in *Osage*. *Id.* at 522 n.2. Thus, Perry's opening of the baby powder container and manipulation of its contents with his Leatherman blade while on the train did not exceed the scope of Jackson's consent.

**B.      Warrantless Search of the Container at the DEA's Office**

Jackson argues that the warrantless search of the container and its contents at the DEA's office violated his Fourth Amendment rights.  He claims that the plain view exception to the warrant requirement does not apply because Perry was not certain that there was contraband inside the container.  This argument is unavailing.

The warrantless search of the baby powder container at the DEA's office was valid.  A warrantless search of a legally seized container is invalid unless it falls within one of the narrow and well-delineated exceptions to the warrant requirement.  *Flippo v. West Virginia*, 528 U.S. 11, 13 (1999); *United States v. Corral*, 970 F.2d 719, 725 (10th Cir. 1992).  A warrantless search can be conducted if law enforcement agents see, within plain view, the contents of a container and it is apparent or a "foregone conclusion" that such contents are contraband.  *Corral*, 970 F.2d at 725.  "[W]here the police already possess knowledge approaching certainty as to the contents of the container, the search of the container does not unreasonably infringe upon the individual interest in preserving the privacy of those contents."  *Id.* at 725-26.

The plain view exception to the warrant requirement applies to the search which took place at the DEA's office.  When Perry first searched the container pursuant to Jackson's consent, he saw a white powdery substance inside a baggy hidden within the baby powder container.  Perry testified that, based on his

training and experience, he thought it was very unlikely that the baggy contained something other than narcotics.[2]  Moreover, Perry knew that Jackson had paid for his coach ticket in cash and was traveling from California to Ohio.  Perry knew that such travel arrangements were consistent with those of drug smugglers.  Perry knew that drugs are sometimes smuggled inside baby powder containers.  Under such circumstances, it was a foregone conclusion that the baby powder container held drugs.  As a consequence, the plain view exception applies to the search of the baby powder container which took place in the DEA's office.

## C.     Privacy of Information Disclosed by Amtrak

Jackson argues that Amtrak is a government agency whose disclosure to Perry of the information surrounding his travel plans violated his rights under the Privacy Act, 5 U.S.C. § 552a, and the Fourth Amendment.  As a result, Jackson argues, he is entitled to suppression of all the evidence seized during his encounter with Perry.

Assuming, without deciding, that the Privacy Act can create a reasonable expectation of privacy that could support suppression of evidence, Jackson's

---

[2]Jackson argues that this testimony demonstrates that Perry was not absolutely certain that the container held narcotics.  Therefore, Jackson argues, it was not a foregone conclusion that the contents were contraband.  Jackson misreads the "foregone conclusion" standard.  A "foregone conclusion" is supported by the police's "knowledge *approaching* certainty" that the contents of the container are contraband.  *United States v. Corral*, 970 F.2d 719, 725-26 (10th Cir. 1992) (emphasis added).  It is clear from our precedent that *absolute* certainty is not required.  *Id.*  Jackson's argument is therefore unavailing.

argument fails because Amtrak is not an agency within the meaning of the Privacy Act. The Fifth Circuit has held that Amtrak is not subject to the Privacy Act. *See Ehm v. Nat'l R.R. Passenger Corp.*, 732 F.2d 1250, 1251-53 (5th Cir. 1984). Noting that Amtrak's charter, 45 U.S.C. § 541, specifically provides that Amtrak "will not be an agency or establishment of the United States Government," the *Ehm* Court held that Amtrak was not an "agency" within the meaning of the Privacy Act. *Ehm*, 732 F.2d at 1252-53. In *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 392 (1995), the Supreme Court specifically noted that Amtrak's charter is dispositive of Amtrak's status as a government entity for the purposes of the Administrative Procedure Act because Congress controls whether Amtrak is subject to the provisions of the statutes which it enacts. The Privacy Act is part of the Administrative Procedure Act. 5 U.S.C. § 552a. As a consequence, we find the *Ehm* Court's reasoning persuasive and hold that Amtrak is not a governmental agency within the meaning of the Privacy Act. Because the Privacy Act does not apply to Amtrak, Jackson's argument necessarily fails.

## IV. CONCLUSION

For the foregoing reasons, this court **AFFIRMS** the district court's judgment.