**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 25, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

ISMAEL COBIAN MENDOZA,

    Defendant - Appellant.

No. 15-7042

_____

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 6:14-CR-00077-RAW-1)**
_____

Chance Cammack, Research and Writing Specialist (Julia L. O'Connell, Federal Public Defender, and Scott A. Graham, Assistant Federal Public Defender, with him on the briefs), Office of the Federal Public Defender, Muskogee, Oklahoma, for Defendant-Appellant.

Edward Snow (Mark F. Green, United States Attorney, and Linda A. Epperley with him on the brief), Office of the United States Attorney, Muskogee, Oklahoma, for Plaintiff-Appellee.
_____

Before **KELLY**, **BRISCOE**, and **HARTZ**, Circuit Judges.
_____

**HARTZ**, Circuit Judge.
_____

Defendant Ismael Mendoza appeals the district court's denial of his motion to

suppress drugs found in two ice chests in the vehicle he was driving. He argues (1) that

his consent to search the vehicle was invalid because he gave his consent while an officer was unlawfully detaining him, (2) that the search of the first chest exceeded the scope of his consent when the officer dumped its packaged contents (frozen seafood) on the pavement and pried open the chest's lining, and (3) that the search and destruction of the second ice chest was unlawful because the officers did not have probable cause specific to that chest.

We affirm. The officer had reasonable suspicion justifying Defendant's detention when he consented to the search. The search of the first chest did not exceed the scope of Defendant's consent; Defendant, who was observing the search, raised no objection to the manner of the search, and the officers' actions did not destroy or render useless the chest or its contents before they saw a drug package in the lining. And the search of the second chest was lawful because the officers had probable cause to search the vehicle and destruction of the chest was reasonable in the circumstances.

**I. BACKGROUND**

We summarize the evidence at the suppression hearing. On November 3, 2014, Defendant was driving a rental car on Interstate 40 in Oklahoma when he was stopped for speeding by Oklahoma Highway Patrol Trooper Matthew Mize. Defendant, who was traveling alone, drove a half mile before pulling over, a longer distance than was typical. Trooper Mize observed signs of "hard travel," such as food and trash in the passenger seat, suggesting that Defendant had been trying to avoid stopping on his way to his destination. R., Vol. 2 at 17. Defendant appeared nervous. He was visibly shaking when he handed over his driver's license and did not calm down during the stop. When Mize,

2

who recognized that the car was a rental, asked for the rental agreement, Defendant produced insurance papers instead. Mize then reached into the vehicle and got the rental agreement himself.

Mize asked Defendant to sit in the patrol car (which was facing the rear of Defendant's vehicle) while he filled out a warning ticket. In the patrol car Defendant told Mize that he was traveling from his home in Tucson, Arizona, to Memphis, Tennessee, to visit family for two weeks. The rental agreement, however, indicated that Defendant was going to return the car in five days. Defendant also told Mize that he was a construction worker but work was slow so he was taking a vacation. Mize noticed that his hands were not typical of those who perform manual labor; they were clean and well-manicured. Although Mize told Defendant that he was only going to issue him a warning, Defendant did not calm down as others do. He remained nervous, sitting in a rigid position in the patrol car and staring at his vehicle.

After Mize issued the written warning, Defendant was starting to exit the patrol car when Mize asked him: "Hey sir, can I ask you a question?" R. Supp. (Video Recording) at 9:04. Defendant responded, "What's that?" *Id.* at 9:06. At Mize's request, Defendant sat back down in the car and closed the door. Mize then questioned him about the difference between his reported travel plans and the rental-agreement dates. Defendant backtracked, stating that he was actually returning to Tucson within the rental period. Mize then asked Defendant if he could search Defendant's vehicle, and Defendant agreed. Asked whether he had any firearms or illegal drugs in the vehicle, Defendant denied having any, but he told Mize that he had fish and shrimp in the back.

3

Mize left Defendant in the patrol car and told him to honk the horn if he wanted to stop the search. Defendant did not honk the horn at any time during the search.

Trooper Daren Koch responded to a call by Mize to assist with the search of Defendant's car. In his patrol car was a dog trained to alert to the presence of drugs, but the troopers did not use it. The troopers observed two ice chests in the vehicle, one in the trunk and one in the back seat. They first opened the ice chest in the trunk, which contained wrapped fish and shrimp. Koch thought the chest was seven or eight years old and showed signs of tampering: one of the hinges was broken, the lip of the inner lining was partially separated from the outer shell, and one screw was missing while several others looked as if they had been taken in and out multiple times. Also, he found it significant that Defendant was traveling with seafood because smugglers sometimes use the smell of seafood to mask the presence of drugs. After removing the seafood packages from the ice chest and placing them on the ground, Koch used an upholstery tool to pry the inner and outer liners farther apart. This separation may have caused indents in the foam but otherwise did not damage the ice chest. Although Koch had performed similar searches on many ice chests that did not contain contraband, he had never been notified by the owners that he had damaged them.

As he separated the liners, Koch noticed that the lining contained what appeared to be spray foam that did not originally come with the ice chest. When he pried the lining farther apart, he saw the corner of a black, taped bundle. During his time as a law-enforcement officer, Koch had often encountered similar bundles containing drugs. He then tore open the outer lining of the ice chest and found 13 bundles containing marijuana

4

(later weighed at 890 grams). The troopers next similarly dismantled the second ice chest, finding two bundles containing methamphetamine (weighing 879 grams).

Defendant was indicted in the Eastern District of Oklahoma on one count of possession with intent to distribute methamphetamine and marijuana. *See* 21 U.S.C. § 841(a)(1), (b)(1)(A), (b)(1)(D). He moved to suppress evidence from the traffic stop, arguing that the search violated his Fourth Amendment rights; but the district court denied the motion. He then pleaded guilty to the indictment as part of a conditional plea agreement under which he reserved the right to appeal the denial of his motion to suppress. He was sentenced to 87 months' imprisonment.

## II. DISCUSSION

When reviewing a district court's denial of a motion to suppress, "this court views the evidence in the light most favorable to the government and accepts the district court's findings of fact unless clearly erroneous." *United States v. Jackson*, 381 F.3d 984, 988 (10th Cir. 2004). "The ultimate determination of reasonableness under the Fourth Amendment, however, is reviewed *de novo*." *Id.*

Defendant challenges the legality of this encounter on three grounds. First, he contends that the troopers failed to obtain valid consent to search. Second, he argues that the troopers exceeded the scope of his consent by prying open the lining of the first ice chest and putting the contents on the ground. Third, he challenges the troopers' destruction of the second ice chest without individualized probable cause that it contained unlawful drugs.

**A. Validity of Consent**

A search can be conducted when officers have received a valid consent. *See Florida v. Jimeno*, 500 U.S. 248, 250–51 (1991). Defendant challenges the validity of his consent, however, on the ground that his consent was given while he was being detained in violation of the Fourth Amendment.

"When a consensual search follows a Fourth Amendment violation, the government must prove both (1) that the consent was voluntary under the totality of the circumstances, and (2) that there was a break in the causal connection between the illegality and the evidence thereby obtained." *United States v. Fox*, 600 F.3d 1253, 1257 (10th Cir. 2010) (internal quotation marks omitted). Defendant argues that his detention was unlawful after Trooper Mize issued the written warning, marking the end of the justification for the stop. Ordinarily, "once an officer returns the driver's license and registration, the traffic stop has ended and questioning must cease; at that point, the driver must be free to leave." *United States v. Moore*, 795 F.3d 1224, 1229 (10th Cir. 2015) (brackets and internal quotation marks omitted). Defendant contends that he did not consent to further detention when he responded "What's that" to Mize's request to ask an additional question, R. Supp. (Video Recording) at 9:04, and Mize therefore illegally extended the traffic stop.

But we need not address whether Defendant consented to extending the stop, because Defendant was lawfully detained up to the time he consented to the search of his vehicle. A traffic stop may be extended after the initial reason for the stop (here, a traffic violation) has been satisfied if the officer has "an objectively reasonable and articulable

6

suspicion that illegal activity has occurred or is occurring." *Moore*, 795 F.3d at 1229 (internal quotation marks omitted). Such reasonable suspicion was present here. Most importantly, Defendant's travel plans made no sense. He was driving intensely (leaving food and trash on the passenger seat) from Tucson to Memphis for a two-week vacation when the rental car was to be returned in five days in Tucson. "We have credited inconsistent travel plans as a factor contributing to reasonable suspicion when there are lies or inconsistencies in the detainee's description of them." *United States v. Simpson*, 609 F.3d 1140, 1148–49 (10th Cir. 2010). *But cf. id.* at 1149 ("In contrast, this circuit has been reluctant to deem travel plans implausible—and hence a factor supporting reasonable suspicion—where the plan is simply unusual or strange because it indicates a choice that the typical person, or the officer, would not make."). Also, Defendant showed various signs of extreme nervousness: taking a half mile to pull over, visibly shaking, handing over his insurance papers rather than the rental agreement, and remaining nervous even after the trooper informed him he would only receive a warning. And Defendant's hands did not appear to be those of a construction worker, his claimed occupation. Detaining Defendant to ask for an explanation was reasonable in the circumstances. *See United States v. Alcarez-Arellano*, 441 F.3d 1252, 1260 (10th Cir. 2006) (reasonable suspicion based in part on implausible travel plans and extreme nervousness); *United States v. Williams*, 271 F.3d 1262, 1267–70 (10th Cir. 2001) (reasonable suspicion when defendant's reported travel plans were inconsistent with his rental-car agreement, he displayed unusual nervousness which did not dissipate during the stop, and he possessed a short-range radio). A few questions and answers could have

7

dissipated suspicion; but Defendant's answer to the first question did the opposite. He forgot about the two weeks with family and said he would be back in Tucson to return the car in time. The detention up to the consent to search was lawful.

### B. First Ice Chest

Defendant contends that even if his consent was valid, the search of the first ice chest exceeded the scope of that consent. "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness— what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Jimeno*, 500 U.S. at 251. The consenting party "may of course delimit as he chooses the scope of the search to which he consents." *Id*. at 252. Absent an explicit limitation, however, "a general consent to search [a car] includes closed containers within the vehicle, and this court has specifically ruled that a failure to object to the continuation of a search indicates that the search was conducted within the scope of the consent given." *United States v. Santurio*, 29 F.3d 550, 553 (10th Cir. 1994) (citation omitted). Still, "before an officer may actually destroy or render completely useless a container which would otherwise be within the scope of a permissive search, the officer must obtain explicit authorization, or have some other, lawful, basis upon which to proceed." *United States v. Osage*, 235 F.3d 518, 522 (10th Cir. 2000).

Defendant's consent was to a general search without limitations. His consent therefore extended to closed containers in his vehicle. But he contends that both prying open the lining of the ice chest and dumping the seafood on the road damaged his property beyond any reasonable construction of his consent. We disagree.

8

Trooper Koch's further separation of the already separated inner and outer lining of the ice chest did not permanently damage it. The linings had been partially separated before the search by the tampering required for the drugs to be placed between the linings. And Koch testified:

> [The o]nly damage that would be done is it would possibly leave a bit of an imprint in the foam in there. You can separate it generally down three or four inches away from that foam, and then that liner will go right back underneath that lip. There's no damage done to the exterior of it or the interior of it.

R., Vol. 2 at 49–50. We have noted that "some dismantling of an item searched" comes within the scope of a general consent. *Osage*, 235 F.3d at 521–22 n.2; *see, e.g.*, *Santurio*, 29 F.3d at 553 (removing screws to look under carpeting in vehicle did not exceed scope of consent); *United States v. Pena*, 920 F.2d 1509, 1512, 1514–15 (10th Cir. 1990) (removal of quarter-panel vent of vehicle with screwdriver did not exceed scope of consent). Likewise, minor or *de minimis* damage does not by itself render a search excessive. *See Jackson*, 381 F.3d at 989 ("[A]ny loss or contamination of the baby powder by [the officer's] search with his blade was *de minimis* and well short of the type of 'complete and utter destruction or incapacitation' that was the focus of our concern in *Osage*.").

Also, Defendant had been told that he could halt the search at any time by honking the horn, yet—despite a clear view of the troopers' actions—he never honked the horn. *See Santurio*, 29 F.3d at 553 ("[F]ailure to object to the continuation of a search indicates that the search was conducted within the scope of the consent given."). We hold that the district court did not clearly err in determining that prying apart the cooler's lining was

9

within the scope of Defendant's general consent to search. *See Jackson*, 381 F.3d at 988 ("The district court's conclusion that a search is within the boundaries of a defendant's consent is a factual finding that this court reviews for clear error.").

Nor was Defendant's scope of consent exceeded, as he now argues, by the troopers' "dumping out fish, which needs to be kept cold, onto the road, essentially destroying them." Aplt. Br. at 17. It helps to know that the fish were wrapped, so they were not contaminated by the removal. And the fish would not be spoiled by being left outside for the short period necessary to search the chest.

Of course, as Defendant concedes, once the trooper saw a black bundle in the lining of the first ice chest, he had probable cause to search the chest regardless of the scope of consent. Defendant does not challenge what the troopers did to the first chest in removing the bundles. The district court properly denied Defendant's motion as to the first ice chest.

### C. Second Ice Chest

Defendant does not contest that after the troopers found drugs in the first ice chest, they had probable cause to search his vehicle and any container that could conceal drugs or evidence. *See Wyoming v. Houghton*, 526 U.S. 295, 302 (1999) ("When there is probable cause to search for contraband in a car, it is reasonable for police officers—like customs officials in the founding era—to examine packages and containers without a showing of individualized probable cause for each one."); *United States v. Ross*, 456 U.S. 798, 825 (1982). Officers could therefore search the second ice chest.

10

But Defendant contends that the Fourth Amendment prohibited destroying the second ice chest during the search without probable cause that the specific item contained evidence. He argues that such individualized probable cause was not present because the second ice chest appeared brand new, did not contain fish, and was in another part of the vehicle.

This circuit has no precedent directly in point. In several cases in which a search of a car destroyed part of the car or a container within it, the officers had probable cause focused on the item destroyed. *See United States v. Carbajal-Iriarte*, 586 F.3d 795, 799, 802–03 (10th Cir. 2009) (probable cause to cut open upholstered seat after dog alerted to that seat); *United States v. Lyons*, 510 F.3d 1225, 1232, 1241–42 (10th Cir. 2007) (probable cause permitted destruction of spare tire when officers observed that tire appeared to have been recently placed on the rim and was excessively heavy, and "echo test" indicated that something was stored within the tire); *see also Carroll v. United States*, 267 U.S. 132, 162, 172 (1925) (during search supported by probable cause, officers cut open upholstered seat which was harder than expected when tapped on by officers). None of these cases addressed what specificity, if any, was required to permit destruction of part of the vehicle or a container.

We therefore turn to general Fourth Amendment principles. As we explain, these compel the conclusion that the constitutionality of the *manner* of conducting an otherwise lawful vehicle search is governed by whether it was reasonable under the circumstances.

To begin with, although a search warrant is generally not required to search a motor vehicle if officers have probable cause, *see Ross*, 456 U.S. 798 at 804–09, the rules

11

governing the search are the same as if a warrant had been obtained.  The Supreme Court

has told us that the permissible *scope* of such a search "is no narrower—and no

broader—than the scope of a search authorized by a warrant supported by probable

cause."  *Id.* at 823.  We infer that the *manner* of conducting a warrantless vehicle search

is likewise governed by the same standards as for warranted searches.

The manner of executing a search authorized by a warrant is governed by a

reasonableness standard.  *See Dalia v. United States*, 441 U.S. 238, 257 (1979) ("[I]t is

generally left to the discretion of the executing officers to determine the details of how

best to proceed with the performance of a search authorized by warrant—subject of

course to the general Fourth Amendment protection 'against unreasonable searches and

seizures.'" (footnote omitted)); *Lawmaster v. Ward*, 125 F.3d 1341, 1349 (10th Cir.

1997) ("Although the Constitution does not specifically address how an officer should

execute a search warrant, a warrant that is reasonably executed will withstand

constitutional scrutiny.").  In particular, courts determine the lawfulness of damaging or

destroying property in executing a warrant by assessing the reasonableness of the police

conduct.  *See United States v. Ramirez*, 523 U.S. 65, 71 (1998) (upholding destructive no-

knock entry; "[t]he general touchstone of reasonableness which governs Fourth

Amendment analysis . . . governs the method of execution of the warrant.  Excessive or

unnecessary destruction of property in the course of a search may violate the Fourth

Amendment . . . ."); *Dalia*, 441 U.S. at 258 ("[O]fficers executing search warrants on

occasion must damage property in order to perform their duty."); *Lawmaster*, 125 F.3d at

1349 ("[W]hen executing a search warrant, an officer is limited to conduct that is

reasonably necessary to effectuate the warrant's purpose."); 2 Wayne R. LaFave, Search and Seizure § 4.10(d), at 971–72 (5th ed. 2012) ("The destruction of property in carrying out a search is not favored, but it does not necessarily violate the Fourth Amendment; the standard is reasonableness.").

Turning to the case before us, there is no dispute that the troopers could search the second ice chest. And we hold that dismantling the chest was reasonable under the circumstances. After all, the troopers had just found drugs in the modified lining of the other ice chest. Neither Defendant nor our imagination has suggested any nondestructive way to retrieve evidence from the chest's lining. Defendant argues that the second ice chest was less obviously tampered with than the first one, did not have seafood in it, and was in another portion of the car. But those considerations hardly dissipated the probable cause to search the vehicle or the reasonableness of searching inside the lining of one ice chest after discovering drugs secreted in the lining of another.

### III. CONCLUSION

The judgment of the district court is AFFIRMED.

13