BRISCOE, Circuit Judge,
dissenting.
I respectfully dissent. The majority suggests that when police officers in a vehicle merely ask a pedestrian to stop walking to continue their conversation, the pedestrian has been seized. Applying Supreme Court precedent holding consensual far more authoritative encounters between officers and citizens, I would conclude that Hernandez gave the Denver Police Officers his name in the course of a consensual encounter. In the alternative, the Officers had reasonable articulable suspicion to stop Hernandez.
I
On October 20, 2014, Officers Morghem and Walton were on patrol in Denver, Colorado. After sunset, they arrived in their marked patrol car at the unlit intersection of West 10th Avenue and Mariposa Street. The intersection is located in a high crime area.
As a result of the ongoing construction of a high-rise at that intersection, there was no sidewalk along the site or any cars parked there. The construction site also was fenced in, in part for security reasons, and the police had responded to thefts in construction areas nearby. Officer Mor-ghem was especially alert to and suspicious of individuals near this specific construction site because a few months prior to that evening, he had arrested a trespasser inside that fenced-in area of the site.
Officer Morghem observed through the darkness a person near the corner, clad in black clothing, and wearing two backpacks. When first seen, the man, later identified as Hernandez, was in the street and walking next to the fence. Given his knowledge of the area and prior thefts, Officer Mor-ghem was immediately suspicious when he saw Hernandez next to the fence. In addition, Officer Morghem had experience arresting “lookout[s].” Aplt. App. at 108. He *1271 therefore was concerned that the individual he saw outside of the fence could be working as a lookout for others inside. Officer Morghem also found Hernandez’s behavior “odd” in that there was a sidewalk on the other side of the street, but Hernandez was not using it. Id.
Officer Walton, who was driving the patrol car, pulled up next to Hernandez and started talking to him as Hernandez continued to walk. The patrol car was approximately five feet from Hernandez. Officer Morghem asked him if “they could talk to him,” and Hernandez replied, “yeah, what’s up?” Id. at 109. Because Hernandez kept walking, Officer Walton drove the car alongside to keep pace.
Officer Walton then asked Hernandez “where he was coming from and what he was doing....” Id. Hernandez said that he “was coming from his grandmother’s house and was ‘just trying to go home.’ ” Id. Officer Morghem asked “where his grandmother lived,” to which Hernandez replied that he “didn’t know the address.” Id.
At some point thereafter, Officer Walton “asked Hernandez to stop so that they could talk to him, and he complied.” Id Next, the district court found, the Officers asked Hernandez for his name and date of birth. Hernandez provided his name, but a false birth date. The “entire conversation” took, “at the most,” two minutes. Id.
Officer Morghem’s search of the police department’s database revealed that Hernandez had an outstanding arrest warrant. Officer Walton then parked the car. The Officers stepped out of the patrol car, as Hernandez “started walking away ‘quickly ” from them. Id. at 110. As Officer Morghem approached Hernandez, he noticed Hernandez reaching for his waistband. Officer Morghem asked if Hernandez “had a gun.” Id. Hernandez answered, “ ‘yes,’ and a gun fell on the ground.” Id. The Officers arrested Hernandez and retrieved the gun.
II
Hernandez was subsequently indicted on one count of knowingly possessing a firearm after having been previously convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). He filed a motion to suppress arguing that he was unlawfully seized at the time he identified himself. He contended that by asking him to stop, the Officers seized him without reasonable suspicion and improperly discovered his identity, and thus the warrant and firearm. The government responded that the encounter was consensual or, alternatively, was an investigative detention supported by reasonable suspicion. The district court granted the motion, determining that when Hernandez was asked to stop, the encounter became a seizure, unsupported by reasonable suspicion.
III
In reviewing the district court’s order, we view “the evidence in the light most favorable to the prevailing party,” and “defer to the district court’s findings on questions of fact, reviewing only for clear error. We review questions of law de novo.” United States v. Mendoza, 817 F.3d 695, 698 (10th Cir. 2016) (citations omitted). Specifically, we review de novo “the ultimate determination of reasonableness under the Fourth Amendment.” United States v. Moore, 795 F.3d 1224, 1228 (10th Cir. 2015) (quotation marks and citation omitted).

1. Was the Encounter Consensual?

We recognize three categories of encounters between police officers and citizens:
(1) consensual encounters which do not implicate the Fourth Amendment;
(2) investigative detentions which are Fourth Amendment seizures of limited *1272 scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause.
United States v. Madden, 682 F.3d 920, 925 (10th Cir. 2012) (citation omitted).
With respect to consensual encounters, the Supreme Court has long held that,
[0]fficers do not violate the Fourth Amendment’s prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen. ... Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions [and] ask for identification ... provided they do not induce cooperation by coercive means.
United States v. Drayton, 536 U.S. 194, 200-01, 122 S.Ct. 2105 (2002) (citations omitted).
Specifically, “interrogation relating to one’s identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure.” INS v. Delgado, 466 U.S. 210, 216, 104 S.Ct. 1758 (1984). But if a police officer “detain[s]” a person “for the purpose of requiring him to identify himself,” the officer has “performed a seizure of his person subject to the requirements of the Fourth Amendment.” Brown v. Texas, 443 U.S. 47, 50, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). Thus, the threshold issue is whether Hernandez’s encounter with the Officers was consensual. I would conclude that it was.
“We review de novo the relevant circumstances to determine whether an interaction between an individual and a law enforcement officer is a consensual encounter that does not implicate the Fourth Amendment.” United States v. Rogers, 556 F.3d 1130, 1137 (10th Cir. 2009) (quotation marks and citation omitted). The following facts are relevant:
(1) the threatening presence of several officers; (2) the brandishing of a weapon by an officer; (3) physical touching by an officer; (4) aggressive language or tone of voice by an officer indicating compliance is compulsory; (5) prolonged retention of an individual’s personal effects; (6) a request to accompany an officer to the police station; (7) interaction in a small, enclosed, or non-public place; and (8) absence of other members of the public.
Id. at 1137-38 (emphasis added) (citation omitted).
This “list of factors is not exhaustive, nor is- any one factor dispositive.” Id. at 1138 (citation omitted). While relevant, “[o]nce such a consensual encounter begins, an officer is not required to inform a suspect that he does not have to answer the officer’s questions or that he is free to leave at any time.” United States v. Wallace, 429 F.3d 969, 975 (10th Cir. 2005) (citation omitted). To decide “whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers’ requests or otherwise terminate the encounter.” Madden, 682 F.3d at 925 (quotation marks and citation omitted). That reasonable person inquiry “focuses on the objective viewpoint of one in the defendant’s circumstances.” United States v. Carbajal-Iriarte, 586 F.3d 795, 801 (10th Cir. 2009) (citation omitted).
In the present case, Hernandez agreed to speak with the Officers and continued walking while answering their questions, responding to every question without objection. When Officer Walton asked Hernandez to stop walking, Hernandez did so *1273 without objection. Officer Morghem then asked Hernandez to identify himself, and he complied. Approximately two minutes elapsed from the beginning of the conversation until the discovery of the outstanding warrant.
Supreme Court precedent establishes that the circumstances here do not support the legal conclusion that Hernandez was seized. In United States v. Mendenhall, after Mendenhall was arrested for possessing narcotics, she argued that she was seized from the moment that agents approached her in an airport concourse and asked her questions. 446 U.S. 544, 547-50, 100 S.Ct. 1870 (1980). The majority here notes that only a plurality of the Menden-hall Court held the initial encounter, during which Mendenhall’s identification and plane ticket were confiscated, was consensual. See id. at 555, 100 S.Ct. 1870 (Stewart, J., plurality). Today’s majority also attempts. to distinguish Hernandez’s circumstances from Mendenhall’s by framing the question as whether Mendenhall was asked “to stop behaving in a certain manner (e.g., to stop walking) while she was answering [the agents’] questions.” Majority Op. at 1267.
But Mendenhall’s import is that the majority of the Court held that the encounter was consensual after Mendenhall’s effects were returned. 446 U.S. at 557-58, 100 S.Ct. 1870 (Stewart, J., majority). And the Court held that the agents’ request that Mendenhall accompany them to a far-off, enclosed, and government-controlled location did not transform the encounter into a seizure. Id. Specifically, the Court stated that Mendenhall “was not told that she had to go to the office, but was simply asked if she would accompany the officers” after her “ticket and identification” had been “returned to her,” a “voluntarily consented to” encounter. Id. at 558, 100 S.Ct. 1870. The majority here fails to draw any meaningful distinction between an officer’s request that a person preparing to catch a flight accompany him to an airport security office to continue their consensual conversation and an officer’s request that a person stand in place to do the same. If Mendenhall could have refused the request to move to the agents’ office, Hernandez could have refused the request to stop here.
Further, in Florida v. Rodriguez, the defendant was being followed by several narcotics officers through an airport. 469 U.S. 1, 3-4, 105 S.Ct. 308 (1984) (per cu-riam). One of Rodriguez’s compatriots noticed the officers and warned Rodriguez to “[g]et out of [t]here.” Id. Rodriguez then “attempted to move away from” the officers. Id at 4, 105 S.Ct. 308. A detective “showed his badge and asked [Rodriguez] if they might talk,” and “suggested that they move approximately 15 feet” away. Id. The detective requested identification and, seeing Rodriguez had none, asked his name. Id. The Court held that “[t]he initial contact between the officers and [Rodriguez], where they simply asked if he would step aside and talk with them, was clearly the sort of consensual encounter that implicates no Fourth Amendment interest.” Id. at 5-6, 105 S.Ct. 308 (emphasis added) (citations omitted).
The majority is correct that the Court also “[a]ssum[ed], without deciding, that after [Rodriguez] agreed to talk with the police, moved over to where his cohorts and the other detective were standing, and ultimately granted permission to search his baggage,” he was seized. Id. at 6, 105 S.Ct. 308 (emphasis added). But the majority is mistaken if what it means to suggest is that the Court held that Rodriguez was seized once he complied with the request to move aside, implying Hernandez was seized when he stopped here. Just the opposite conclusion is true. The Court held that when the presumptive seizure oc *1274 curred, it was supported by “justifiable suspicion,” based, in part, on “the contradictory statements concerning the identities of’ Rodriguez and his compatriot, statements they made after they complied with the officers’ request to move locations. Id. Rodriguez thus confirms that Hernandez was not seized merely because the Officers’ requested he alter his movements to continue their encounter.
The majority also attempts to distinguish Rodriguez on the basis that Hernandez was in an “isolated location” at night. Majority Op. at 1266. But that does not follow because Hernandez was not isolated on the “very public” street and, the majority agrees, he had been engaged in a consensual nocturnal encounter just moments earlier. Id. Mendenhall and Rodriguez belie the conclusion that the Officers could not ask Hernandez to stop walking without having seized him.
Moreover, although the district court noted that Hernandez’s encounter was with two officers, it did not find that their presence was threatening. Indeed, both Officers remained in the car, weapons holstered and unseen. See Rogers, 656 F.3d at 1137-38. The district court also suggested that driving the police car five feet away from Hernandez might have made a reasonable person feel unable to terminate the conversation. But the district court did not find, and no evidence suggests, that Officer Walton drove in an aggressive manner or blocked Hernandez’s route.
To explain its agreement with the district court, the majority cites Michigan v. Chesternut for the proposition that, “the very presence of a police car driving parallel to a running pedestrian could be somewhat intimidating....” 486 U.S. 567, 575, 108 S.Ct. 1975 (1988). But the majority relegates the end of that sentence to a footnote. The Court stated that “this kind of police presence does not, standing alone, constitute a seizure.” Id. The majority’s claim that Chesternut “simply further illustrates the coerciveness of the circumstances leading up to Officer Walton’s request that Mr. Hernandez stop walking” grafts Chesternut’s conclusion onto Hernandez’s circumstances while ignoring Chesternut’s facts. Majority Op. at 1265 n.2. The Court held that four officers’ “pursuit” of a pedestrian' — during which they “dr[o]ve alongside him” in their police cruiser as he ran away from them — was not a seizure. Chesternut, 486 U.S. at 576, 108 S.Ct. 1975. If those officers’ actions were merely “somewhat intimidating,” id. at 575, 108 S.Ct. 1975, then Officer Walton’s passive driving maneuvers here hardly qualify as coercive. Thus, Chesternut simply underscores that Hernandez’s consensual encounter continued even as the Officers kept pace with him as he walked.
The district court next emphasized that the Officers “freely admitted] that when citizens walk away from them, these citizens are not indicating that they are affirmatively consenting to being questioned by the Officers.” Aplt. App. at 116. The majority treats this as highly significant, noting that Officer Walton admitted that Hernandez “tried not to stop to talk to” them. Majority Op. at 1265 (quoting Aplt. App. at 80). The majority appears to disclaim reliance on the district court’s legal analysis of why that request is “key” to its determination. But the majority must be relying on the district court’s erroneous legal analysis when it calls Officer Walton’s “request that Mr. Hernandez stop walking” a “key factor” to its determination that Hernandez was seized. Id at 1264. For the majority offers no substitute legal analysis to explain why the request is “key” to its holding.
Moreover, the district court’s analysis of that “key factor” is triply flawed. First, the district court’s discussion of Officer Walton’s subjective views of the situation come *1275 from Officer Walton’s report; which was not admitted into evidence and for which we have no context. The majority does not even address this error; it also relies on the report.
Second, in any event, the Officers’ feelings regarding whether Hernandez wanted to speak to them are irrelevant to analyzing this question of law. United States v. Kimoana, 383 F.3d 1215, 1224 (10th Cir. 2004). The majority admits that such “subjective intentions” are irrelevant, but does not explain what facts, as opposed to Officer Walton’s feelings, demonstrate that “the situation objectively looked [coercive] from a contemporaneous account.” Majority Op. at 1265 n.3. Rather, the undisputed objective facts are that Hernandez answered every question posed to him, did not remain silent, and never said that he wished to end the walk-and-talk encounter. Cf. United States v. Jones, 701 F.3d 1300, 1305-07 (2012).
Third, even if those errors were not fatal to its conclusion, the district court’s underlying premise was tautological — the request that Hernandez stop walking does not prove that request transformed the encounter into a seizure. “The exploitation issue focuses solely on [a] defendant’s grant of consent, not on the bare request, or the reasons underlying it. While the police may exert coercion in the manner in which they request [a] defendant’s consent, the request itself ... is not exploitation.” United States v. Carson, 793 F.2d 1141, 1149 (10th Cir. 1986). Thus, the relevant question is whether the circumstances surrounding the request or the manner in which it was made objectively compelled compliance. Id. The request itself is not determinative of whether Hernandez’s free will was overpowered. Id. That he complied also does not answer whether a reasonable person would have felt compelled to do so. The majority’s tacit reliance on the district court’s analysis for the legal import of Officer Walton’s request necessarily suffers from these same errors.
Further, the Officers did not seize any of Hernandez’s personal effects, touch him, verbally threaten him, or brandish their weapons. The majority claims that “the presence of two uniformed and armed officers ... is a relevant factor” here. Majority Op. at 1266. The factors enumerated in Rogers point to a different conclusion. 556 F.3d at 1137-38. The mere fact that the Officers were uniformed and armed does not negate this consensual encounter when the Officers did not act in any way to threaten Hernandez.
The Officers also maintained a conversational tone throughout the encounter. And Hernandez remained free to walk away, as demonstrated by his having done so after the warrant was discovered and Officer Walton parked the patrol car. At the earliest, therefore, Hernandez was only seized once Officer Morghem stepped out of the patrol car and approached him, but by that time there was probable cause for an arrest.
The circumstances surrounding the Officers’ encounter with Hernandez were a lesser show of authority than those circumstances the Court held consensual in Dray-ton, where it reviewed an encounter between three officers and a bus passenger. 536 U.S. at 204, 122 S.Ct. 2105. The Court explained; “There was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits,' no threat, no command, not even an authoritative tone of voice. It is beyond question that had this encounter occurred on the street, it would be constitutional.” Id.
The majority emphasizes that in Dray-ton the officer testified that if the defendant had wished to leave the bus, he “would have been allowed to do so without argument.” Id. at 198, 122 S.Ct. 2105. But *1276 no facts in Drayton suggest the defendant knew that, and it is hardly the point. To terminate what the Court held was a consensual encounter, Drayton would have been required to stand up, ignore one officer’s requests (an officer who had previously leaned over Drayton’s shoulder, come within eighteen inches of his face, and reached over him to pat-down and arrest his compatriot), walk down the narrow aisle of the bus, and pass another officer who was positioned at the door. Id. at 198-99, 122 S.Ct. 2105.
In contrast, to terminate this encounter, Hernandez need only have ignored the Officers’ request and continued walking. The majority seeks to blunt Drayton’s force here by claiming that Hernandez “attempted the very act that would have been permitted” in that case, “but he was asked to halt.” Majority Op. at 1267 (emphasis added). But the majority’s reliance on the request merely highlights, again, that the majority is eliding the distinction between a request and a command. See, e.g., Carson, 793 F.2d at 1149. In fact, Drayton itself explicitly distinguishes the coercive force of commands from that of requests. 536 U.S. at 204, 122 S.Ct. 2105. And, as the majority cedes, no facts here indicate that Hernandez was commanded to stop. Applying Drayton, as we are required to do, would preclude us from holding that the Officers’ non-authoritative request that Hernandez stop walking compelled his compliance.
Finally, the district court explained that Hernandez was questioned “in a public space, but” not “within view of other persons.” Aplt. App. at 115. This, that the encounter occurred at night, and the fact that the Officers did not tell Hernandez that he was free to disregard their request appear to be the only facts that support the majority’s conclusion. See Rogers, 556 F.3d at 1137-38. But in Delgado, the Court emphasized that “[u]nless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment.” 466 U.S. at 216, 104 S.Ct. 1758.
More specifically, the Court held that none of the factory workers in question were seized during the government’s entries upon their workplace. Id. at 220-21, 104 S.Ct. 1758. As relevant here, the Court noted that when one of'the workers was “[wjalking from one part of the factory to another, [she] was stopped by [a government] agent and asked where she was born.” Id. at 220, 104 S.Ct. 1758 (emphasis added). The Court held that none of the workers were seized. Id. at 221, 104 S.Ct. 1758. The majority is mistaken that “a key premise of’ Delgado “was that “when people are at work their freedom to move about has been meaningfully restricted, not by the actions of law enforcement officials, but by the workers’ voluntary obligations to their employers.’ ” Majority Op. at 1266-67 (quoting Delgado, 466 U.S. at 218, 104 S.Ct. 1758). Actually, the key premise of Delgado here is what the Court held — the consensual encounter between government agents and a factory worker remained so after the worker was stopped from walking and continuing her obligations to her employer. 466 U.S. at 219-21, 104 S.Ct. 1758.
The Delgado Court determined that despite the presence of numerous agents and the interior setting, the worker who was stopped remained free to ignore the agents to continue her work, and therefore had consented to their inquiries. Id. The Supreme Court’s holding that this encounter was consensual undermines the majority’s conclusion that Hernandez was seized merely because no one else saw the nighttime encounter on a public street and the *1277 Officers did not tell him that he could ignore their request. None of the facts here suggest that a reasonable person in Hernandez’s situation would have been so intimidated that he believed he was not free to ignore the request.
Applying these precedents, I would conclude that Hernandez was not seized until after the Officers discovered his outstanding warrant.

2. Did Reasonable Suspicion Support this Stop?

Alternatively, even if Hernandez had been- seized, that brief seizure was supported by reasonable suspicion that Hernandez was about to commit a crime — he appeared to be easing the construction site.
“The Fourth Amendment permits brief investigative stops ... when a law enforcement officer has ‘a particularized and objective basis for suspecting the particular person stopped of criminal activity.’ ” Navarette v. California, — U.S. -, 134 S.Ct. 1688, 1687, 188 L.Ed.2d 680 (2014) (quoting United States v. Cortez, 449 U.S. 411, 417-18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), and citing Terry v. Ohio, 392 U.S. 1, 21-22, 88 S.Ct. 1868 (1968)). An officer may effect such a stop “even though probable cause to arrest is lacking.” United States v. Rodriguez, 739 F.3d 481, 485 (10th Cir. 2013) (quoting Terry, 392 U.S. at 22, 88 S.Ct. 1868).
Under this “reasonable suspicion” standard, “we ask ‘whether the officer’s action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.’ ” Id. (quoting Terry, 392 U.S. at 20, 88 S.Ct. 1868). “Reasonable suspicion arises from the combination of an officer’s understanding of the facts and his understanding of the relevant law.” Heien v. North Carolina, — U.S. -, 135 S.Ct. 530, 536, 190 L.Ed.2d 475 (2014). “The reasonable suspicion analysis does not consider each of an officer’s observations in isolation, but rather is based on the totality of the circumstances, taking into account an officer’s reasonable inferences based on training, experience, and common sense.” United States v. Garcia, 751 F.3d 1139, 1143 (10th Cir. 2014) (quotation'marks and citation omitted).
We review this question of law de novo. Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). Reasonable suspicion “need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.” United States v. Fager, 811 F.3d 381, 386 (10th Cir. 2016) (quoting United States v. Arvizu, 534 U.S. 266, 274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)). “For reasonable suspicion to exist, an officer must ‘articulate something more than an inchoate and unparticularized suspicion or hunch.’ ” Moore, 795 F.3d at 1229 (quoting United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581 (1989)). However, “reasonable suspicion must meet only a minimum level of objective justification.” Fager, 811 F.3d at 386 (quotation marks and citation omitted).
In the case at hand, the district court reached an erroneous conclusion of law by misapplying precedent and failing to incorporate in its analysis a critical fact that it found: Hernandez’s purported inability to recall his grandmother’s address. Reasonable suspicion may derive from “ ‘a series of acts, each of them perhaps innocent’ if viewed separately, ‘but which taken together warrant[ ] further investigation.’ ” Sokolow, 490 U.S. at 9-10, 109 S.Ct. 1581 (quoting Terry, 392 U.S. at 22, 88 S.Ct. 1868). The Supreme Court has held that “innocent behavior will frequently provide the basis for a showing of’ reasonable suspicion, so “the relevant inquiry is not *1278 whether particular conduct is ‘innocent’ or ‘guilty,’ but the degree of suspicion that attaches to particular types of noncriminal acts.” Id. at 10, 109 S.Ct. 1581 (quotation marks and citation omitted). The district court erred by examining each of Hernandez’s innocent behaviors in isolation.
Specifically, the district court analyzed those facts piecemeal, determining whether each fact “standing alone” would be “sufficient to confer reasonable suspicion.” Aplt. App. at 118. But that mode of analysis is contrary to precedent. United States v. Simpson, 609 F.3d 1140, 1152 (10th Cir. 2010); see Sokolow, 490 U.S. at 9-10, 109 S.Ct. 1581. The district court then dismissed each fact as “perfectly innocuous” or, “even” when “combined” together, “simply” unable to “satisfy” the “reasonable suspicion standard,” without explaining how its conclusion derived from the aggregate, but limited facts it discussed. Aplt. App. at 118.
Further, the district court failed to consider its own factual finding regarding Hernandez’s statement immediately preceding the request to stop. The district court found that Officer Morghem “asked ... Hernandez where he was coming from and what he was doing, and Hernandez responded that he was coming from his grandmother’s house and was ‘just trying to go home.’ When Morghem asked where his grandmother lived, :.. Hernandez responded that he didn’t know the address.” Id. at 109. That is, Hernandez failed to identify, even generally, where his grandmother lived. The district court did not account for the legal significance of this fact in its analysis.
Of course, “[b]ecause our analysis depends on the totality of the circumstances, we” must “consider this additional factor here.” Moore, 795 F.3d at 1229 n.2. The majority concludes otherwise on the basis that while this fact is cited by the government on appeal, neither the Officers nor the government argued in the district court that it contributed toward reasonable articulable suspicion. But that is irrelevant. The district court made that factual determination, and we have no license to ignore it in conducting our review of the “totality of the circumstances” here. Garcia, 751 F.3d at 1143.
More specifically, as to the Officers, “the fact that [an] officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer’s action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.” Devenpeck v. Alford, 543 U.S. 146, 153, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004) (citations omitted) (quoting Whren v. United States, 517 U.S. 806, 814, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)). That neither Officer alerted the district court to the significance of one of the facts it later found does not cabin our de novo review of whether all of the facts are sufficient as a matter of law to amount to reasonable suspicion.
As to the government, the majority is of course correct that it bears the burden to prove reasonable articulable suspicion. Simpson, 609 F.3d at 1146. But the majority is incorrect that the government’s failure to underscore before the district court the legal significance of an undisputed fact circumscribes our de novo review of this question of law. The government has always maintained that a stop was justified. And the district court found, among other facts which would support reasonable suspicion, that Hernandez stated that he did not know his grandmother’s address. The government has presented us with everything necessary to determine the legal significance of this and all other facts that the district court found.
Turning to Hernandez’s statement, it was not inconsistent, but a reasonable offi *1279 cer could have found it evasive. In Simpson, we held that “lies, evasions or inconsistencies about any subject while being detained may contribute to reasonable suspicion.” Id. at 1149. For example, “fairly minor evasions and inconsistencies,” such as not knowing one’s “mother’s telephone number” or not “provid[ing] specifics regarding” topics one broaches all contribute to arousing reasonable suspicion. Id, at 1150 (citation omitted).
Here, Hernandez was asked where he was coming from and where he was going. He volunteered that he had just come from his grandmother’s house, an innocent response. But when he was asked where she lived, not her exact address, he responded that he did not know the address. His response was evasive.
Again, the district court fundamentally erred by adopting a piecemeal approach to the facts and disregarding each of them standing alone or for independent insufficiency, thus failing to apply the totality-of-the-circumstances test. See Garcia, 751 F.3d at 1143; Simpson, 609 F.3d at 1152. Viewed objectively and in its totality, Hernandez’s conduct instead adds up to enough that a reasonable officer would have a valid basis to inquire further, at least enough to ask him to stop and identify himself. Navarette, 134 S.Ct. at 1687, 1691. More specifically, Hernandez was walking through a “high-crime area in nighttime darkness.” Fager, 811 F.3d at 389-90 (citing Illinois v. Wardlow, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)). And given the Officers’ knowledge of the area, including prior thefts, Hernandez’s nighttime presence in the street, walking beside the construction site, clad in all black, and carrying two backpacks supports the Officers’ reasonable suspicion. See Garcia, 751 F.3d at 1143. Yet even having observed all of this, the Officers did not request that Hernandez stop. They did so only after he gave an evasive answer.
Rather than taking a divide-and-conquer approach, we must examine together all of the facts of which the Officers were aware when they requested that Hernandez stop and identify himself. Fager, 811 F.3d at 386. The Officers located Hernandez (a) at night, (b) wearing all black clothing, (c) and two backpacks, (d) walking in the street instead of on a nearby sidewalk, (e) through an unlit area, (f) in a high-crime location, (g) next to a construction site where they were particularly concerned about thefts, (h) and he purported to have come from his grandmother’s house but claimed not to know the address. These facts, taken together, demonstraté that once Hernandez gave his evasive answer, the Officers had an objectively reasonable suspicion that his stated reason for his presence in the area was false and that he was casing the construction site.
At that point, the Officers had reasonable suspicion to request that Hernandez stop walking and identify himself, leading to the discovery of the warrant, and thus probable cause to arrest. Therefore, even if Hernandez’s encounter with the police was not consensual, the Officers had reasonable suspicion to briefly stop him and ask his name. I would reverse the district court’s order and remand for trial.